UNITED STATES DISTRICT COURT for the
EASTERN DISTRICT OF MICHIGAN

```
--------------------------------------------------------------------------x
                                            :
WILLIAM HUSEL                               :
                                            :
                        Plaintiff,          :      CASE NO. ____
                                            :
            – against –                     :
                                            :
                                            :      COMPLAINT
TRINITY HEALTH CORPORATION                  :
                                            :
                        Defendant.          :      Jury Demanded
                                            ::
--------------------------------------------------------------------------x
```

Plaintiff Dr. William Husel ("Husel"), by his undersigned counsel, allege as follows against defendant Trinity Health Corporation ("Trinity"):

## NATURE OF THE ACTION

1.      This action is brought by a doctor who—prior to his termination, villainization in the press, arrest, indictment on 25 counts of murder, and eventual full acquittal—was a dedicated intensivist who worked an overnight shift in the ICU of Mount Carmel West Hospital ("MC West") for five years.

2.      MC West was a Trinity-owned hospital in a poor area of Columbus Ohio. The ICU there saw some of the sickest patients in Columbus, and regularly treated patients who overdosed on illicit narcotics (among many other patient populations with high mortality risk).

3.      From time to time during those years, the MC West ICUs would admit a patient who was simply too sick to survive, and in some cases, the families of those patients would request that life support be withdrawn so that the patient and their loved ones could avoid needless suffering.

1

4.      This was by no means a daily event, but it was common enough, and it was something the ICU staff trained for, and had clear policies for. Those policies were designed to ensure that each patient received the best possible care in the last minutes of their lives.

5.      Until late November 2018, the ICU MC West was an outstanding unit that served several underprivileged communities in western Columbus. Dr. Husel and the ICU staff were proud to be a part of it.

6.      But in December 2018, everything began to change rapidly, for the worse. Acting on orders from Trinity, its Michigan-based corporate parent organization, Mount Carmel fired Dr. Husel, placed 13 nurses and 7 others on leave, and drastically changed its ICU policies from patient-centered policies that left appropriate discretion to its trusted physicians, to new hard-rules that endangered patients, and delayed urgent care.

7.      Following a cursory investigation conducted by MC West, MC West informed Trinity that it had discovered that over the course of many years, Dr. Husel had been using levels of opioid medications and benzodiazepines to treat patients that were in the process of imminently dying (following the withdrawal of life support) that were substantially higher than his peers' practices.

8.      These actions did not violate any policies of the hospital or of Trinity, nor did they violate any nationally accepted standards for the use of opioid medications for treating pain associated with the dying process in patients.

9.      The MC West investigation uncovered no indication whatsoever that Dr. Husel intended to hasten death or do anything other than make the dying process easier for his patients.

10.     In a meeting with Dr. Husel, the MC West Vice President of Medical affairs spoke to Dr. Husel about joining a committee to develop standards and best practices around these very-end-of-life issues.

11.     MC West also informed Trinity that Dr. Husel's practices had gone unnoticed (regardless of their appropriateness) for years because of lax enforcement of policies relating to controlled substances and because of poor record keeping regarding the management of controlled substances, most notably the highly stigmatized opioid, fentanyl.

12.     Many doctors choose hydromorphone as the opioid of choice to treat pain in palliative and actively dying patients because of the societal stigma associated with fentanyl. However, Dr. Husel utilized it because if his familiarity with the medication which he developed while working as a resident in anesthesiology (an area of medicine where the use of fentanyl is very common).

13.     Over the weekend following MC West's report, Trinity's Chief Medical Officer Daniel Roth (a former general medicine practitioner with no experience in critical care) and other senior executives decided it was best for Trinity to portray Dr. Husel's care as a series of tragic crimes, as opposed to compassionate care that violated no policies but exposed systemic weaknesses.

14.     Roth and other senior executives made the decision to falsely portray what had occurred as something sinister.

15.     In the following days:

   a.   Trinity directed that Dr. Husel be terminated;

   b.   Trinity directed that MC West meet with the Franklin County Prosecutor and report a belief that the dosages were intended to hasten death notwithstanding the

fact that they know this not to be substantiated as every witness they interviewed

explained the intent was not to hasten death but to provide appropriate end-of-life

care; and

c.   Trinity hired a crisis communications firm to develop a media and community

outreach plan that would focus all negative attention of Husel and the ICU staff,

and set up an escalating timeline of planned disclosures, designed specifically to

encourage prosecution, convince the public that Husel had committed crimes and

convince the press that the story was about a rogue doctor and that Mount Carmel

and Trinity were reacting as good corporate citizens.

16.     After making the initial report to the prosecutor, Trinity caused MC West to

engage in a communication blitz by:

a.   telling the families of dozens of patients that their loved ones had been overdosed

by Dr. Husel ("likely hastening death") and inviting them to engage counsel;

b.   telling the press a false and misleading story that Dr. Husel had given "potentially

fatal" doses of medication to patients;

c.   later, telling the press a false and misleading story that some of Dr. Husel's

patients might have survived; and

d.   repeatedly advertising their cooperation with criminal authorities, intentionally

raising the pressure on prosecutors to such an extent that the office issued a rare

public statement regarding an ongoing investigation urging the public to be calm.

17.     The Franklin County Prosecutor's office empaneled a grand jury and presented

misleading testimony from Trinity representatives, who intentionally left out material

information about what occurred to convince the jury that the dosages were so high that the only explanation was that Dr. Husel had intentionally hasted their death.

18.     The Franklin County Prosecutor's office admittedly relied on Trinity, and specifically on Dr. Dan Roth, in making its determination that Dr. Husel's dosing decisions were intentional criminal acts as opposed to well-intentioned care, and relied on Trinity in presenting this theory to the grand jury.

19.     Indeed, during Dr. Husel's criminal trial for which he was ultimately acquitted on all counts, the lead investigator repeatedly testified that he was not an expert and relied on Trinity for his information regarding appropriate dosing of medication at end-of-life, as well as any inferences to make based upon the dosages.

20.     In June 2019, Dr. Husel was indicted on 25 counts of intentional murder.

21.     In January 2022, the prosecution voluntarily dismissed 11 of the counts (those that involved patients who received the lowest dosages of opioid pain medication).

22.     On April 20, 2022, Dr. Husel was acquitted of the remaining 14 counts.

23.     Everyone in Columbus relied on Trinity (and Mount Carmel's actions at Trinity's direction) to answer the question of whether anything Dr. Husel and his team did was wrong. In December 2018, Trinity set a course of events into action that would have devastating consequences for Dr. Husel, the ICU staff and a horrible chilling effect on end-of-life pain management. The responsible individuals at Trinity had no basis to tell the prosecutor and the public that Dr. Husel had caused anyone any harm, much less that he had intentionally done so. They could have corrected the misstatements at any time before the indictment—or even after his acquittal—but they did not.

24.     Rather, Trinity kept doubling down by encouraging the prosecutor to pursue the case and making disclosures to the public that Trinity had "learned" of new instances where Dr. Husel had been the cause of tragedy, including one that inexplicably indicated that five of the patients could have been saved.

25.     When the indictment was finally issued, Trinity promptly issued a final press release, fired dozens of individuals and declared that a new and promising chapter in the story of Mount Carmel was beginning. Its goal had been achieved.

## PARTIES

26.     Dr. William Husel is a resident of the state of Ohio. At all relevant times he was a trained anesthesiologist with additional credentials in critical care, who worked as an intensivist in the ICU at MC West, a Trinity hospital.

27.      Trinity Health Corporation is a national Catholic health system based in Michigan with 92 hospitals and 109 continuing care facilities, home care agencies, and outpatient centers in 22 states. Trinity is an Indiana for-profit corporation, headquartered in Livonia, Michigan.

28.     Many of the facts set forth herein are the subject of two other proceedings in Ohio, both of which relate to the Defendant's public statements and alleged defamation, and were commenced in December 2019—30 months before Dr. Husel's acquittal and the accrual of the sole claim at issue here. Discovery in those actions is largely complete, and any materials from them that is relied upon here has already been placed in the public record and is not subject to any operative sealing order. (Ex. 1 – Trinity/Mount Carmel withdrawal of request to seal).

29.     This public record was relied on in a partially dispositive decision that remanded one of the matters to the Franklin Court of Common Pleas and dismissed a claim under the

Lanham Act brought by certain of Dr. Husel's colleagues. As a result, all materials are part of the public record, notwithstanding any indications to the contrary.

## JURISDICTION AND VENUE

30.     This Court has personal jurisdiction over Trinity because it is headquartered in this district.

31.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because Plaintiff is a citizen of Ohio and Defendant is a citizen of the states of Indiana and Michigan.

32.     Venue is proper under 28 U.S.C. § 1391(b)(1) because the Defendant is headquartered in this district.

## STATEMENT OF FACTS

*Dr. William Husel and the Care He Provided in the Mount Carmel West ICU*

33.     Dr. William Husel attended medical school at Ohio University College of Osteopathic Medicine, graduating in 2008. Following medical school, he completed a residency in anesthesiology at Cleveland Clinic in 2012. After that, Dr. Husel completed a fellowship in intensive care, also at Cleveland Clinic, in 2013. (October 2, 2022 Declaration of William Husel ("WH Dec.") ¶ 2, Ex. 2).

34.     In 2013, Dr. Husel accepted a position as an intensivist (a physician for an intensive care unit (an "ICU")) at Mount Carmel West Hospital in Columbus, Ohio. It was a learn-on-the job position. (WH Dec. ¶ 3, Ex. 2). There were no formal medical trainings with respect to practice in the ICU, and because Dr. Husel was assigned exclusively to the night shift, he was always the only physician in the ICU. (4-20-22 Deposition of Dr. David Ralston ("Ralston Dep.") 93:3-17; 2-22-21; Deposition of Beth Macioce-Quinn ("Macioce-Quinn Dep.") 64:1-65:20; WH Dec. ¶ 3, (Ex. 2, Ex. 3, Ex. 4)).

35.     During his tenure in the ICU, Dr. Husel was well regarded by his peers, and, prior to October 24, 2018 (after five years in the ICU), nobody had ever raised a concern regarding the care that he provided (other than issues that Dr. Husel's colleagues brought to his attention, which Dr. Husel would substantively discuss and address and resolve to everyone's satisfaction) (7-22-22 Deposition of Dr. Daniel Roth ("Roth Dep.") 112:23-113:14, 152:8-153:3; Macioce-Quinn Dep. 64:1-65:20; Ralston Dep. 21:12-22 (Ex. 5, Ex. 4, Ex. 3)).

36.     Indeed, Dr. Husel was presented a hospital-wide award (based on voting by the staff) as physician of the year in 2014 and he was nominated again in 2018. (Roth Dep. 113:4-10 (Ex. 5)).

37.     In the ICU, Dr. Husel and his colleagues cared for countless patients, and the care they provided was often the turning point that brought them from critically ill to being on the road to recovery, or at least stabilization. Occasionally, there would be a patient that was too ill to recover and could not survive without aggressive and continuous life-supporting mechanical interventions, such as artificial breathing support (a ventilator), kidney dialysis, and supplemental oxygen; and constant intravenous medicine such as vasopressors (to maintain blood pressure/cardiac function), antibiotics (to combat sepsis), and sodium bicarbonate solution (to correct for acidosis).

38.     In some of those cases, the patients' or their families' previously documented wishes, would instruct the medical staff to withdraw all life-supportive care and allow the patient to expire naturally (a "terminal withdrawal" also known as a "compassionate withdrawal"). Once such a decision is made, the sole goal of the medical staff (physician and nurses) is to provide comfort care (while also taking care not to harm the patient). (Ralston Dep. 62:21-63:4 (Ex. 3)).

39.     While it is not possible to predict how long a patient will survive after

withdrawal, a range of 0 to 60 minutes is common. (Ralston Dep., 44:23-47:5 (Ex. 6, Ex. 3)).

The goal of the ICU physician is to make those minutes as pain free as possible. That can be the

difference between a good death and a bad one. As a former ICU nurse explained:

> 35
>  8…I knew
>  9· ·what it was like to see a bad death and to see a good
> 10· ·death, and they did too….
> []
> 152
> 24…But sometimes, many times, I've seen in my
> 25· ·clinical practice, that when we take away the pain and
> 153
>  1…the patient is no longer tight with stress and their
> ·2· ·body actually relaxes from the release of pain they can
> ·3· ·live longer.
> ·4· · · · · ·And in many cases, it's not just about the
> ·5· ·additional minutes, but when their face is no longer
> ·6· ·contorted in pain, when they're not making a fist
> ·7· ·because they're in pain, when that pain is eased, they
> ·8· ·can actually reach out and hold their loved ones' hands
> ·9· ·or open their eyes and make an emotional connection with
> 10· ·through their eyes with their loved one.
> 11· · · · · ·And I've seen that at the bedside.· I've seen
> 12· ·where once the pain leaves they can make those last
> 13· ·moments into a good memory with their loved one and you
> 14· ·can watch the loved one carry that with them out of the
> 15· ·unit.· It changes the grief that we see.

(2-9-21 Deposition of Rebecca McNeil ("McNeil Dep.") (Ex. 7)).

40.     Withdrawal, by definition, is an extreme shock to the body. The loss of

vasopressors (which leave the system within a minute) could lead to a blood pressure drop of

50% or more, causing symptoms similar to that of a heart attack. The loss of ventilator support

will lead to air hunger (the feeling the body experiences when it cannot breathe), which results in

an experience that is akin to drowning or suffocating.

41.     Narcotic medications, and fentanyl in particular, are good at treating (and preventing) the suffocation-like sensation that dying patients will experience as a result of failing lungs as well as the general pain that actively dying patients experience. Other medications, namely benzodiazepines, can lessen the acute stress experienced by patients who are cognizant of the process, and lessen the body's fight-or-flight reaction for those with diminished awareness. (Declaration of Dr. John B. Downs, M.D. ("Downs Dec.") ¶¶ 7-8 (Ex. 8)).

42.     During his time at Mount Carmel West, Dr. Husel performed multiple terminal withdrawals of care. He observed both good and bad deaths. In some early instances during his tenure, the pain medication he ordered at the outset of the procedure was insufficient to control the patients' pain. (WH Dec. ¶ 5 (Ex. 2)). For example, one of Dr. Husel's patients continued to experience pain until the patient received over 2000 mcg of fentanyl, after which she lived for another several days.

43.     In connection with the withdrawal of life support in a dying patient, pain is easier to prevent than it is to treat. Given the potentially short time that a patient may live after extubation, if the patient begins to experience pain, they might expire before any additional medication—administered after pain is observed—can take effect. (Downs Dec. ¶ 5 (Ex. 8)).

44.     Given Dr. Husel's past experiences caring for critically ill patients in the ICU while they were in the process of dying, he knew that patients in this condition have an increased drive to breathe, and that abrupt changes in their physiological conditions would occur when life support is removed. (WH Dec. ¶ 6 (Ex. 2)).

45.     As a result of these experiences, Dr. Husel became resolved to always provide comfort and prevent his patients from suffering during their deaths. All of Dr. Husel's patients were unique. For some, he ordered 200 micrograms of fentanyl, and for some he ordered 1000

mcg. In one case, where the family specifically spoke about the patient's fear of suffocation (Macioce-Quinn Dep. 23:23-26:10 9 (Ex. 4)), Dr. Husel ordered 2000 micrograms.

46.     Based on his past experiences using fentanyl in the operating room, knowing that it is hemodynamically stable even in the presence of other medications, as well as his past experiences caring for critically ill patients in the ICU throughout the dying process, Dr. Husel used his fourteen years of education, training, and practice, to determine the dosage amount based on the presentation of each individual patient. (WH Dec. ¶ 6 (Ex. 2)).

47.     This approach guided Dr. Husel's dosing decisions. Everything he did was open and recorded. Exigencies occasionally led nurses to bypass real-time pharmacy review with certain patients, but everything was always recorded and immediately available for retrospective review should any concern or question be raised.

48.     Nobody associated with Mount Carmel or Trinity ever said a word to Dr. Husel to question his approach until November 26, 2018, several days after what would be his final day as a practicing doctor. (WH Dec. ¶ 7 (Ex. 2)).

*The Hospital Policies and National Standards That Governed ICU-Setting Terminal Withdrawal of Care in Actively Dying Patients During the Relevant Period*

49.     During Dr. Husel's tenure at Mount Carmel West, there were no policies in place regarding dosing guidelines for the use of opioids and benzodiazepines in connection with terminal withdrawals in the ICU setting. The only hospital policy on the matter stated that pain medications were to be given "as medically indicated," a phrase that vested discretion in the physician. The policy provided no guidance whatsoever on starting doses, maximum doses, or timing of administration. ((2014 Palliative Ventilator Withdrawal Policy), (2017 Palliative Ventilator Withdrawal Policy) Ex. 9, Ex. 10).

50.     Moreover, Dr. David Ralston, the Medical Director of the Mount Carmel West ICU during Dr. Husel's tenure testified that he never "formally…actually look[ed] at" these policies and that he never spoke to residents about them, but rather just taught them what his personal approach to terminal extubation was. (Ralston Dep. 76:12-78:17 (Ex. 3)). During Dr. Husel's tenure, there was no standard order set for terminal withdrawals, nor policies that set standards on which medications to use or appropriate dosages. (Ralston Dep. 33:11-18; Roth Dep. 109:23-110:19 (Ex. 3, Ex. 5)).

51.     Moreover, it was unquestioned that in connection with a terminal withdrawal, there was never a defined maximum dose of fentanyl or any other opioid medication. This was confirmed by Dr. Ralston (Ralston Dep. 33:19-22 (Ex. 3)) and Dr. Daniel Roth (the Chief Medical Officer of the entire Trinity system) (Roth Dep. 146:6-147:8 (Ex. 5)).

52.     The reason there was no maximum dose of fentanyl is obvious: To instate a maximum dose would not account for differences in patient physiology and medical presentation and could result in patient suffering if doctors were prohibited from prescribing as much as the individual patient needed.

53.     While there were recommended dosage levels for fentanyl use in other settings (such as for analgesia in patients who are not in the process of dying, or in procedural settings (i.e., in connection with surgery)), none addressed the unique circumstances and very different medical considerations of a terminal withdrawal.

54.     Indeed, CDC guidelines on the use of opioids in a medical setting not only reject "inflexible standards," but also exclude palliative and end-of-life care from its dosing recommendations entirely. In fact, in a 2022 restatement of its guidelines, the CDC highlighted

that applying its prescribing guidelines to palliative care patents was improper. (November 2022 CDC Clinical Practice Guidelines for Prescribing Opioids for Pain (Ex. 11)).

55.     This includes Mount Carmel's "IV Guidelines"—a guideline and *not* a policy (which Dr. Ralston testified that even he did not use (Ralston Dep. 89:21-90:12 (Ex. 3))). Moreover, the hospital's Medical Administration Policy (which was a nursing policy) indicated that the IV Guidelines themselves need not be followed in circumstances such as terminal withdrawals, where the patient is obese, and where the patient has a documented opioid tolerance. (Ex. 12)). The policy of excluding terminal withdrawals and other palliative care from the guidelines was consistent with CDC then-extant (and current) CDC policy.

56.     All of the 25 events at issue in this action involved terminal withdrawals, some of which were performed on obese patients, some of which were performed on patients that had a documented opioid tolerance, and some of which were performed on obese patients who also had a documented opioid tolerance. (Downs Dec. ¶ 10 (Ex. 8)).

57.     Moreover, the fact that there is no medically determined maximum dose of opioids in connection with terminal withdrawal is well-documented in medical literature.

58.     As such, between 2014 and 2018, there were no Mount Carmel policies nor any medical standards or literature that would suggest that anything was improper about the approach that Dr. Husel took with those end-of-life patients for whom comfort was the only remaining consideration. Any dosing limitations for this patient population would be contrary to medical principles and CDC guidance.

*In the Fall of 2018, Pharmacists Raise a Concern About Fentanyl Dosing and Potential "Diversion" (i.e., Theft) of Medication, the Hospital Fails to Follow Its Own Policies and Never Informs Dr. Husel*

59.     The events that led to this action commenced on October 24, 2018. On that date, Dr. Husel ordered a 1000 microgram bolus dose (an IV dose given all at once) of fentanyl in

connection with a terminal withdrawal. The order was verified by a pharmacist, Gregory

Dresback. Later that night, another pharmacist, Taylon Schroyer, raised a concern about the

dosage with his supervisor, Randy Miles. (5-20-22 Deposition of Randy Miles ("Miles Dep.")

55:12-56:5 (Ex. 13)).

60.     Notwithstanding the concern, none of the three pharmacists mentioned this

concern to Dr. Husel. In his deposition, Mr. Miles testified that he did not feel that there was a

requirement to speak with Dr. Husel, stating that under his understanding of the applicable policy

for addressing and escalating concerns ((Ex. 14) "VOICE Incident or Occurrence Reporting

Policy" (the "VOICE Report Policy")), there was no indication at that time of whether an

"incident or occurrence" had occurred and the issue was being "investigated." (Miles Dep.

73:17-74:11 (Ex. 13)).

61.     Similarly, Dr. Swanner testified that he chose not to mention the issue with Dr.

Husel because he had not yet determined whether there was even any risk of harm. (Swanner

Dep. 35:22-36:4 (Ex. 15)).

62.     In depositions in a factually related action brought by ICU staff, none of Trinity-

aligned witnesses could provide a substantive answer as to why nobody spoke to Dr. Husel about

their concerns until after he was placed on leave.

63.     The VOICE Report Policy was clear that when any concern is raised about a

physician's care of a patient, that physician must be informed "before the end of the shift."

Under the policy, an "incident" included "any event…that is inconsistent with normal

operations… [as well as events with a] potential for injury." (Ex. 14).

64.     Yet "concerns" regarding Dr. Husel's care were discussed among three

pharmacists, one administrator, and at least three physicians (over the course of 28 days during

which three events occurred) before the November 21, 2018 meeting that led to Dr. Husel being placed on leave. Dr. Husel was finally spoken to on November 26.

65.     Moreover, though the VOICE Report Policy clearly defined the process to be taken in documenting and managing concerns, that process was entirely ignored. Shroyer did not file a VOICE report that night, and neither did Miles.

66.     Rather, Randy Miles spoke with Kathryn Barga about the issue. Ms. Barga was not a physician, but rather a patient safety and risk officer. (5-19-22 Deposition of Kathryn Barga ("Barga Dep.") 114:15-21 (Ex. 16)). Ms. Barga then reviewed the medical record to see what the dosages at issue were. She did not immediately enter a VOICE report either.

67.     Rather, she sought guidance from Dr. Larry Swanner, the Vice President of Medical Affairs for Mount Carmel West. Dr. Swanner advised that the best course of action was to have Dr. Husel's care considered as part of a "peer review." (Barga Dep. 140:15-141:10 (Ex. 16)).

68.     Only after Dr. Swanner advised that the issue be sent to peer review did Ms. Barga enter the VOICE report. In doing so, Ms. Barga elected a severity level of "4" which indicated that no harm had come to the patient, but that an event that risked harm had occurred, and the patient had been monitored and treated to preclude harm. (Barga Dep. 101:6-22 (EX. 16) Barga VOICE Report (Ex. 17)).

69.     However, the next regularly scheduled meeting of the Peer Review Committee was canceled. (Swanner Dep. 36:5-37:12 (Ex. 15)). Between October 25 and November 19, 2018, nothing further happened, and Dr. Husel was never informed of anyone having any concern whatsoever with his medical practices.

*After a Second VOICE Report, Dr. Larry Swanner Reviews Medical Records, Rules Out Diversion, and Holds a Meeting with Hospital Leadership*

70.     On November 19, 2018, another pharmacist raised a concern to Randy Miles by email following another patient who received 1000 mcg of fentanyl after the family decided to remove their loved one from life support.  Miles copied the relevant portion of the email and pasted it into a message to Kathryn Barga.  (Ex. 18).

71.     While the pharmacist stated a concern regarding the "large dosage" (mistakenly thinking the patient had reported her own pain score), the report also stated concerns that "one nurse removed the meds from the Pyxis and a different nurse then administered them 30 minutes later…" continuing, "I do not want to make assumptions or accusations regarding what might be going on in the ICU, but it is worth noting that some of the same names are routinely involved when these circumstances occur." (*Id.*).

72.     Miles explained in his deposition that these statements both reflected a concern about diversion (i.e., theft of medication), as opposed to dosage. (Miles Dep. 82:15-85:17 (Ex. 13)).

73.     After this second report, Barga and Swanner spoke again, and Dr. Swanner decided to "start [his] own investigation." (Swanner Dep. 36:5-37:12 (Ex. 15)). Though Dr. Swanner did speak to other physicians about the dosages, he again decided not to make any direct inquiry to Dr. Husel to ascertain why Husel had chosen the dosage he ordered. (Swanner Dep. 37:17-38:15 (Ex. 15)).

74.     Documents suggest that Barga spoke with the President of Mount Carmel West, Sean McKibben, and Chief Nursing Officer, Dina Bush, on November 19. (Barga Dep. 159:15-160:10 (Ex. 16)). Barga could not recall the conversation, but Sean McKibben did. (7-14-22 Deposition of Sean McKibben ("McKibben Dep.") 14:17-17:22 (Ex. 19)).

75.     Dr. Swanner's investigation entailed reviewing the patient's medical records to ascertain whether the medications were, in fact, administered (ruling out diversion) and then speaking about the medications and dosage with two physicians: Dr. Gina Moody (a critical care physician) and Dr. Phillip Santa-Emma (a palliative care physician).[1]

76.     In speaking to Dr. Moody, Dr. Swanner learned that:

40
[…]
·7· ·Q.· · · · ·Okay.· So do you recall what did Dr. Moody
·8· ·say?
·9· ·A.· · · · ·She told me that she was not aware of any
10· ·new protocols that would advocate the utilization of
11· ·these doses of fentanyl in particular, but of any
12· ·drug like this during terminal extubation, she
13· ·typically does not use these levels or these doses
14· ·except in extenuating circumstances.
15· · · · · · · She indicated that there may rarely be
16· ·patients that have developed such a tolerance to
17· ·narcotics that they require this high of a dose, but
18· ·usually you start low and have to work up to that
19· ·dose to achieve the desired result.· You don't start
20· ·at that high a dose.
21· · · · · · · And she could remember using doses that
22· ·high once every few years. And she had told me that
23· ·she can't imagine that there would be three patients
24· ·in the course of one month, essentially, that would
25· ·require doses this high, especially to start with.

(Swanner Dep. 40:7-25 (Ex. 15)).

77.     As such, Dr. Moody did not rule out the possibility that Dr. Husel's dosages could be appropriate in cases where the patients' charts showed an indication of high opioid tolerance.

---

[1] The administration of pain medication in connection with terminal withdrawal is different in a critical care (ICU) setting than it is in a palliative care setting. In a palliative care unit, patients are often expected to survive longer, and pain medication must be managed based on a timeline that is substantially longer than the 0-60 minutes rule of thumb that applies in a critical care setting, where patients may already be in respiratory or cardiac failure. (Downs Dec. ¶ 4 (Ex. 8)).

78.     Dr. Swanner did not tell Dr. Moody any details regarding the patients, including any indications of opioid tolerance (Swanner Dep. 42:18-43:9 (Ex. 15)), even though the medical records of each of the three patients did show signs of tolerance. (Downs Dec. ¶¶ 21, 22, 24 (Ex. 8)).

79.     By the time Dr. Swanner spoke to Dr. Moody, it was November 21 and a third formal concern had been raised by the pharmacy concerning Dr. Husel's practices. (Swanner Dep. 42:18-43:9 (Ex. 15)).

80.     The report related to the patient that received 2000 micrograms of fentanyl, after her family had told the ICU staff that their mother's greatest fear was suffocation.

81.     The patient in question's medical records showed that she had been taking 50 mg twice a day of morphine as pain management in the preceding months, indicating a potentially profound tolerance. (Downs Dec. ¶ 24 (Ex. 8)). 50mg of morphine is the equivalent of 500 micrograms of fentanyl. Therefore, when the dose was determined for this patient, it was informed, in part, by the fact that medical records indicating that the patient was already receiving the equivalent of 1000 micrograms of fentanyl on a daily basis, and discussions with family in which they requested Dr. Husel ensure that the patient did not feel as though she was suffocating during the dying process.

*Dr. Husel Is Temporarily Taken off the Schedule, and Meets with Hospital Medical Leadership to Discuss His Practices and the Lack of Hospital Policies*

82.     On the morning of November 21, after the third VOICE report, Barga forwarded an email from Miles to McKibben (Ex. 20) which led to a meeting of hospital leadership. (McKibben Dep. 19:20-21:3 (Ex. 19)).

83.     At that meeting, the group decided that Dr. Swanner should speak to Dr. Husel about his practices after the Thanksgiving holiday, and that Dr. Husel should skip his shift over

that weekend and stay off the schedule until the issues had been addressed. (McKibben Dep.

26:16-27:17 (Ex. 19)).

84.     After the meeting, Dr. Swanner reached out to Dr. Husel to tell him not to report

for work, but to come in for a meeting the following Monday. (Swanner Dep. 51:16-52:15 (Ex.

15)). On Monday, November 26, 2018, Dr. Swanner, Dr. Ralston, and Dr. Husel met. Dr.

Swanner prepared a written note of the meeting shortly after it concluded. (Ex. 21).

85.     At the meeting, Dr. Swanner and Dr. Ralston discussed their concerns about Dr.

Husel's dosing practices. (Swanner Dep. 52:19-53:6 (Ex. 15)). In the conversation:

a.  Dr. Husel explained that he understood that the doses of certain medications were

not typical of other critical care doctors and that he used them, and was

comfortable with them, based on his training in anesthesia, but that he understood

why questions could be raised. (Swanner Dep. 54:4-13 Ex. 15)).

b.  Dr. Husel explained that he had experiences earlier in his career where patients

were given lower doses that had been ineffective and led to an emotionally and

physically traumatic event for the patient and the family and that Dr. Husel

"didn't want that to ever happen to any patient. So, he [was] giving higher doses

of medications to ensure that [it] would never occur." (Swanner Dep. 54:21-55:14

(Ex. 15)).

c.  Dr. Husel explained that he had done his own research on end-of-life extubation

and that he believed there was academic/research support for the higher doses he

used. (McKibben Dep. 38:13-39:4 (Ex. 19)).

d.  In response to questions about the possibility of hastening death, Dr. Husel

responded that he "never wanted to do harm [and] only wanted to provide

comfort." (Swanner Dep. 55:15-56:8; Ralston Dep. 98:7-20; 7-11-22 Deposition

of Edward Lamb ("Lamb. Dep.") 62:9-15 (Ex. 15, Ex. 3, Ex. 22)).

e.   When Dr. Ralston suggested that it might be beneficial for Mount Carmel to

"have more standardization" in terms of medications and dosing in connection

with terminal withdrawals, they discussed Dr. Husel working with Dr. Santa-

Emma to develop a policy. (Swanner Dep. 56:10-57:14 (Ex. 15)).

f.   Dr. Husel made clear that he never intended his practices to be disruptive or cause

concerns, and that he would change his approach to be more in line with what

other physicians did under similar circumstances. (Ralston Dep. 99:12-21 (Ex.

4)).

86.   After the meeting, Dr. Swanner told Dr. Husel that everything would be "OK"

and that Dr. Husel could expect to be back at work "soon." (Husel Dec. ¶ 13 (Ex. 2)).

87.   Over the next few days, there were several meetings held at Mount Carmel. (Ex.

23 ("Incident Timeline")). A meeting of Mount Carmel Leadership was held on November 29,

2018, where Dr. Swanner recounted Dr. Husel's explanation of his approach. (Swanner notes;

McKibben Dep. 42:17-46:19 (Ex. 24, Ex. 19)).

88.   In that time, Mount Carmel had also run a series of reports with different

parameters to review the patients that had undergone terminal withdrawals under Dr. Husel's

care. (Parameter Based Internal Reports (Ex. 25)). One of the reports that looked at patients who

received 500 or more micrograms of fentanyl, but excluded any patients that survived for longer

than 400 minutes (6 2/3 hour), identified 24 patients.

*Trinity Heath Informs and Immediately Commissions Cursory Review of Medications (Not Care) by Highly Respected Anesthesiologist*

89.     The following day, Friday November 30, 2018, Edward Lamb contacted Dr.

Daniel Roth, the Chief Medical Officer of Defendant Trinity Health Corporation to inform Roth

of the issues Mount Carmel had been addressing. (Ex. 25 at TMCN0110821).

90.     Once Trinity became involved, the tenor of the situation changed drastically and

rapidly.

91.     Later that day, Dr. Roth reached out to the Chief Clinical Officer for Trinity

Health, Michigan, Dr. Rosalie Tocco-Bradley, and asked her to review five cases specifically for

an opinion of how the medications might have affected a generic patient, and not to review

whether the doses were warranted under any patient specific circumstances. (Tocco-Bradley

Dep. 71:4-72:22 (Ex. 26)).

92.     Dr. Tocco-Bradley was given a spreadsheet with selected, limited data and not

given access to the patients' medical records, nor was she given an opportunity to speak to the

clinicians involved, nor was she told what the results of her analysis would be used for. (Tocco-

Bradley Dep. 74:7-17, 76:8-77:4, 78:11-25 (Ex. 26)).

93.     On the following Monday, December 3, 2018, Dr. Tocco-Bradley submitted her

report. (Ex. 27). In her deposition, Dr. Tocco-Bradley made clear that her opinions in her

December 3, 2018 report were only an evaluation of the medications used based on her

experience, and were not a review of the circumstances under which they were used, nor of the

reason they were used.

94.     Her two-page report determined that the dosages could be fatal, but in her

deposition, she cautioned that "there's various physiologic responses based on a patient's

preexisting condition, including opioid dependency or tolerance or other substance use, so that's why there is some variability." (Tocco-Bradley Dep. 81:18-82:3 (Ex. 26)).

95.      Dr. Tocco-Bradley made clear that her review was "very limited" and that she "was rendering an opinion on doses of medications and physiologic effects, not on the condition of the patient." (Tocco-Bradley Dep. 85:20-86:8). Dr. Tocco-Bradley was not informed of the reports set forth in Ex. 25, which showed numerous patients who received between 500 and 2000 mcg of fentanyl and survived for longer than 400 minutes.

*Trinity Health Executives Take Unequivocal Control of Mount Carmel's Response: Directs Mount Carmel to Meet with Prosecutor and Hires a Public Relations Firm; Dr. Husel Fired Without Further Review; Defendant's PR/HR Response Given Moniker "Project Lighthouse"*

96.      On Wednesday December 5, with only Dr. Tocco-Bradley's "very limited" review of medications used in connection with 5 of 24 patients (which did not address the patient care itself), Trinity "directed" Mount Carmel to report 24 murders to the Franklin County Prosecutor's Office. (McKibben Dep.  51:15-52:7 (Ex. 19)).

97.      That day, as directed by Trinity, Dr. Swanner and Sean McKibben met with the Franklin County Prosecutor's Officer to report 24 murders by Dr. Husel.  (McKibben Dep. 50:17-24 (Ex. 19)).

98.      According to the public statements of Franklin County Prosecutor Ron O'Brien, at that meeting, at Defendant's direction, the Mount Carmel delegation affirmatively told the prosecutors that they believed that the dosages were "intended to hasten deaths." (See 6/5/19 Transcript (Ex. 28)).

99.      Trinity directed the MC West employees to present this opinion, notwithstanding the fact that it contradicted all the information MC West had collected to that date, and that the hospital was not in possession of any evidence to suggest the doses were administered with an intention to hasten death.

100.    In none of the numerous meetings and calls that Trinity representative Dr. Daniel Roth had with the Franklin County Prosecutor did Roth ever retract or contradict Trinity's unfounded suggestion that the dosage were "so high" that the only explanation was an intent to kill.

101.    None of the individuals at the meeting had the medical training or expertise to evaluate the care that Dr. Husel had provided with respect to the 24 patients that were the subject of the meeting. Nor did Dr. Roth, who would quickly become the primary liaison between law enforcement and Trinity/Mount Carmel.

102.    Sean McKibben and Daniel Hackett were not physicians, and Dr. Swanner admitted in his deposition that he lacked the experience to opine on the care that Dr. Husel provided in these specific instances, proclaiming at one point, "I'm certainly not an expert in palliative care or critical care…." (Swanner Dep. 59:4-5 (Ex. 15)).

103.    The following day, without any further review of any of the 24 cases by anyone, at Trinity's direction, Dr. Husel's employment was terminated, even though formal meetings to discuss his suspension and termination were held four days *post facto* on December 10.

104.    One or two days after directing Mount Carmel to meet with criminal authorities, to falsely accuse Dr. Husel of ordering end-of-life medication with the intention of hastening death, Trinity hired Jarrard Phillips Cate & Hancock, Inc. ("Jarrard"), a Tennessee-based "strategic healthcare communications firm" (i.e., a public relations firm that specializes in working with healthcare clients). (6-17-22 Deposition of Marjorie Curtis ("Curtis Dep.") 9:8-17, 13:8-11, 22:7-23:4; Roth Dep. 178:9-19 (Ex. 30, Ex. 5)).

105.     By Saturday, December 8, Jarrard had already obtained enough information from Trinity and Mount Carmel to produce a first draft of their "National Communications Plan." (Ex. 31).

106.     The first version of the plan, which was a playbook as opposed to a draft disclosure, stated:

> The ongoing investigation into patient care at one of Trinity Health's ministries, Mount Carmel Health System in Columbus, Ohio, will very likely be a public story in the coming days. *The story, which involves a physician that ordered, and nurses that administered, fatal doses of pain medication for at least 24 patients* who were receiving end-of-life care at Mount Carmel facilities, is certain to receive national attention….

> This national discussion can (and should) begin immediately once the story leaks, both in the hopes of controlling the narrative in the news (to the best of our ability) and in beginning to cede a conversation with our employees ministry-wide, with potential recruits and others about how Trinity Health believes end-of-life care should be delivered.

(Ex. 31 at JAR_0000346) (emphasis added).

107.     At the time, there had been no medical review of the patient records that could support (or attempt to support) the conclusion that any patient was given a fatal dose of medication, let alone that 24 patients were given fatal doses of medication.

108.     In the first draft of the "core messages" to be communicated, Jarrard included framing Dr. Husel's care as a "tragedy," referring to the dosages as "fatal," and referencing the involvement of criminal law enforcement. (Ex. 31 at JAR_0000349).

*Mount Carmel Leadership Stages a Scene in the ICU and Mount Carmel Staff Comes to Husel's Defense*

109.     On December 5, 2022, Mount Carmel West leadership announced to the ICU staff that Dr. Husel had been terminated. (2-3-21 Deposition of Earlene Romine ("Romine Dep.) 25:12-26:19; McKibben Dep. 57:16-58:13 (Ex. 32, Ex. 19)). The reaction, according to McKibben, was that the staff expressed a "fair amount of emotion" because "they were close to

Dr. Husel." (McKibben Dep. 58:4-13 (Ex. 19)). At the time, Earlene Romine, the manager of the

ICU nurses, was at a conference in Cincinnati until December 7. (Romine Dep. 25:17-27:10 (Ex.

32)).

110.    During the following overnight shift (from December 6 into December 7, 2018),

Beth Macioce-Quinn circulated a petition that she had drafted calling for Dr. Husel's

reinstatement signed by 36 clinical employees who worked in or with the Mount Carmel West

ICU and were on shift that night. (Ex. 33). In an email transmitting the Petition to Mount Carmel

Leadership, Nurse Macioce-Quinn noted:

> I have unfortunately witnessed some undignified deaths in our unit, with patients gasping
> for air as their family members look on in horror. I truly believe that it is, and always has
> been, Dr. Husel's good intent to honor the dignity and wishes of our patients and their
> family members in regards to palliative care and palliative withdrawal of care.

(Ex. 33).

*Trinity Works With Mount Carmel and PR Firm to Develop "Core Messages" for Their*
*Upcoming Campaign to Convince the Public Dr. Husel Murdered 24 Patients with Two Key*
*Points: (1) Preventing the Anticipated Argument That Dr. Husel Was Trying to Alleviate Pain*
*from Shaping the Public Conversation; and (2) Indictments Would Help Defendant Shape the*
*Public Narrative into a Story of Tragedy Caused by Individuals and an Institution That "Did the*
*Right Thing"*

111.    Even prior to Mount Carmel's December 5, 2018 meeting with prosecutors, they

had engaged the services of a public relations consultant that suggested the hospital publicly

portray Husel as a "villain" and involve law enforcement, and discussed the ICU nurses as "co-

villains." (Lander Dep. 39:17-25; Dep Ex. 39; Strategy Memo (Ex. 34, Ex. 35)).

112.    The Columbus-based firm, Communications Counsel, was quickly sidelined for

Trinity's preferred firm, Jarrard, when it arrived on the scene a few days later. (Lander Dep.

20:17-21:6, 68:5-7 (Ex. 34)). However, the idea that it was to Defendant's benefit for the public

and law enforcement to view the 24 cases as criminal acts persevered.

113.     On December 10, 2018 (the Monday after Jarrard was engaged), Magi Curtis, the lead partner at Jarrard assigned to the matter, sent a detailed email to Bret Gallaway, Trinity's head of marketing and communications. (Lander Dep. 25:10-17; December 10 Strategy Email (Ex. 34, Ex. 36)).

114.     In the email, Curtis sought to learn (i) whether there were any national standards with respect to the use and dosing of pain medications in connection with terminal withdrawal; (ii) whether there were any clear and trained-to hospital or system policies with respect to the use and dosing of pain medications in connection with terminal withdrawal; and (iii) the extent to which Dr. Husel and the nurses were aware of such policies if they existed. (Ex. 36).

115.     The email went into detail to explain the circumstances under which there would be a "risk" "where the emotional energy would go in favor of the doctor/nurses" and how criminal charges against Dr. Husel and the nurses would "lessen, but [] not eliminate, the public perception hit for Mount Carmel/Trinity in the national story." (Ex. 36).

116.     The email presented scenarios on how Trinity should respond based on what the facts turned out to be. It was clear that as of December 10, 2018, Jarrard and the Trinity executives preparing the public relations campaign recognized the publicity risk that would occur if (as was actually the case) neither Mount Carmel nor Trinity had any policies or standards regarding the medications and dosages that should be used in connection with terminal withdrawals in an ICU setting, and that there were no national standards either.

117.     This is why the email (and many subsequent documents) explicitly state that criminal indictments would be helpful to Mount Carmel and Trinity: If the public could be convinced that Dr. Husel's and the nurses' actions were criminal, then the lack of policies at the hospital (surrounding the regulation and use of opioids) would not be perceived as the *cause* of

any issues. If the care the ICU had provided were to be publicly perceived as a crime, the absence of policies would be of limited relevance.

118.    This is why as early as December 5, 2018, Trinity had set in motion what would be a multi-faceted public and private PR campaign to make the public at large, and the key audiences for Trinity—namely the Franklin County Prosecutors' Office—view Dr. Husel's and the nurses' actions as criminal.

119.    The December 10 email is highly illuminating. It describes certain "scenarios" and then analyzes the public relations risk. In one scenario, the document presumes that "Dr. Husel and the nurses knew that the doses they were prescribing/administering were fatal because there is a clear medical standard [and] … Mount Carmel ha[d] a clear dosing policy, documented and trained to." (Ex. 36 at JAR_0001209). But this was not the case, as Trinity and Mount Carmel were well aware.

120.    As Trinity and Mount Carmel's records make clear, there was no clear medical standard, nor did Mount Carmel have a clear, documented, and trained-to dosing policy.

121.    And Dr. Husel's and the nurses' sole intent was to provide compassionate comfort care, as every single witness interviewed by Mount Carmel had said. Jarrad anticipated this possibility too, as it was the precise set of conditions set forth in "Scenario 3." (JAR_0001211-12 Ex. 36). Jarrard had the following advice regarding the "scenario" that accurately described the "situation":

> Situation sets-up [sic] a dynamic almost guarantees for the emotional energy to go in favor of the doctor/nurses because there is no medical standard and Mount Carmel didn't have a clear policy and all involved believed that what they were doing was the most humane thing for the patients.
>
> There is no clear standard and Mount Carmel didn't have a clear policy, which makes leadership looks [sic] like it has decided on a whim when we became alerted to what was being done and felt like it was violating our ethical codes (even though we didn't have a policy) then fired a respected physician and ruined his career.

(JAR_0001212).

122.    This was precisely what occurred. In the email, Jarrad noted that in such a situation, "If Dr. Husel and any nurse are charged, it lessens the blow for Mount Carmel and Trinity Health." (*Id.*).

123.    Even after it was clear beyond any doubt that Trinity and Mount Carmel did not have any policies or practices for end-of-life care, and that every witness, including Dr. Husel, told the hospital that the medications were administered with an intent to provide comfort care, Trinity continued to push a narrative that contradicted the truth of their investigative findings: that Dr. Husel and the nurses made good faith and medically appropriate decisions about patient care in a vacuum of applicable national standards or clear Trinity/Mount Carmel policies.

124.    They certainly did not take Jarrard's advice to "[a]pologize to the employees and physicians for taking a stance when we didn't have a clearly defined policy." (*Id.*).

125.    Rather, Defendant crafted public messages that would make the public and prosecutors believe that there *were* clear policies that were violated, and that a new initiative at the hospital called "Zero Harm" was responsible for identifying the purported breaches.

126.    Thus, the (knowingly untrue) message would be that individuals violated clear policies and were responsible, and that the system worked in rooting out the problem.

127.    This scenario was much more presentable to one of Defendant's other important audience: the United States Conference of Catholic Bishops and individuals (Catholic or otherwise) interested in "sanctity of life" issues. These audiences were routinely referenced in Defendant's planning documents. (See, e.g., TMCN0109265-66, identifying "regulators," "elected officials," "patients," "*church leaders*," and "local/national/trade media" as "key audiences" (Ex. 38)).

28

128. This false presentation of the operative facts, which Jarrad described as "scenario 1(a)," still, according to Jarrard, "set[] up a dynamic where the emotional energy could go in favor of the doctor/nurses," but where "[i]f the county prosecutor finds that Dr. Husel (and the nurses involved) were involved in criminal acts and moves to bring charges, this certainly lessens, but does not eliminate, the public perception hit for Mount Carmel/Trinity Health… ." (Ex. 36 at JAR_0001212).

129. Unsurprisingly, Defendant's public statements were exactly consistent with a textbook effort to pressure a public authority to take an enforcement action. And Defendant's private campaign to discredit Dr. Husel and the nurses started on December 5, where in the very first meetings, Defendant told prosecutors that they believed the medications were "intended to hasten death," even though the results of their interviews indicated precisely the opposite.

130. Not surprisingly, an additional tactic Defendant used to prevent "a dynamic where the emotional energy could go in favor of the doctor/nurses," and to avoid diminishing any public or official interest in prosecuting Husel or others, was to never disclose or suggest what Defendant knew from their interviews and meetings with Dr. Husel and those working with him: that each had unequivocally stated that they only intended to alleviate pain and never wanted to hasten death.

131. Melissa Lander of Trinity would try to explain in a deposition, without irony, that the decision to withhold this crucial detail as religiously required, and argued that by keeping the Plaintiffs' expressions of their bona fide intentions out of the public arena, Defendant was being pious by withholding "judgment" on their actions. (Lander Dep. 105:12-106:2 (Ex. 34)).

132. By December 14, the "Lighthouse" plan had been refined, and drafts of a "core message" plan and responses to anticipated "FAQs" were being circulated and commented on by

Melissa Lander and Brett Justice (the communications team at Mount Carmel), Bret Gallaway

(the head of marketing and communications at Trinity), and Jarrard. (Ex. 40). In a December 14,

2018 email, Gallaway remarked on the plan, noting:

> Many thanks for preparing this strategic, clear and well-organized approach. You were right to talk about the broader view of this tragedy, including the actions of the nurses and pharmacists….

(Ex. 40 at JAR_0000428).

133.    The document Gallaway referred to included the "new set of core messaging

based on [Jarrard's] conversations with Dr. Daniel Roth and Sister Mary Ann Dillion" (Trinity's

Executive Vice President, Mission Integration and Sponsorship). (*Id.* at 429).

134.    The proposed responses to FAQs had settled on describing the actions as

"violating" Mount Carmel's "Standards of Care" even though there were no "standards" at all in

connection with the terminal withdrawal procedure.

135.    At that point, the documents described the medications used as "fatal overdoses,"

though this language would later be modified with the word "potentially." (*Id.* at JAR_0000432).

136.    While the final communication that was issued to the public, after a contentious

internal dispute, modified the term "fatal" with "potentially" to assuage a concern expressed by

Mount Carmel West's CEO, Edward Lamb, the Trinity-created drafts made clear what Trinity's

message was: Dr. Husel prescribed fatal overdoses.

137.    The "Communications Plan" itself (JAR_0000440-44 (Ex. 40)) was another clear

window into the many false messages Defendant would portray, and the audiences for these

messages. Defendant sought to procure indictments against Dr. Husel and others to focus the

public's attention and anger on individuals and to capitalize on the situation by promoting

Trinity's and Mount Carmel's public credibility.

138.    The document "outline[d] communications to achieve []objectives" including to "[p]reserve the reputation of Mount Carmel Heath System (MCHS) and Trinity Health (Trinity) as high-quality healthcare institutions deeply rooted in a strong commitment to mission-driven [(i.e., Catholic)] care" and to "[i]nstill confidence among all audiences important to MCHS and Trinity that we recognize the tragedy…."

139.    This document thus serves as a window of insight. As Magi Curtis had correctly surmised in her December 10 "scenarios" email, Trinity's impulsive reaction in the November 30 –December 5 time frame was likely spurred by a primary concern that what Dr. Husel had done, in prioritizing pain relief and accepting the potential incidental consequences which could include a hastening of death, was in violation of Catholic principles of not interfering with the "sanctity of life."

140.    It did not violate any published medical standard or hospital policy. As the December 14 plan made clear, defining (or "recognizing") the events as a "tragedy" in the first place for their key audiences (including the Catholic Church) was one of Defendant's primary communication goals.

141.    The very first point on strategy put the plan into focus:

Our messaging must appeal to the heart as well as the mind. The messaging from the doctor, nurses and pharmacists will likely be heavy on emotion: "We were just trying to alleviate acute suffering in the patients' last few minutes of life." Our emotional argument must be stronger…While our position would be strengthened by an indictment(s), our argument must be able to stand on its own, regardless of what the D.A. does.

(Ex. 40 at JAR_0000440).

142.    By December 18, 2018, Mount Carmel was already preparing its first public disclosure, which would involve calling the families of all "impacted patients," which was 26 at the time. (Family Outreach Plan (Ex. 42)).

143.    In fact, on December 17, 2018, Dr. Roth met with the Columbus prosecutor, along with counsel and Brett Justice (MCHS head of communications) for the purpose of discussing Mount Carmel's and Trinity's desire to make a public disclosure, and they wanted the prosecutor's approval. (Roth Dep. 207:3-209:21 (Ex. 5)).

144.    The core "strategy" was slightly adjusted on December 19, 2018, in a version that Bret Gallaway revised to incorporate the comments of Richard Gilfillan, the Chief Executive Officer of Trinity. (Revived Messaging Strategy; Lander Dep. 58:9-25 (Ex. 43, Ex. 24)). The "Strategy" section of the December 19 version stated:

> Our messaging must appeal to the heart as well as the mind. The messaging from the doctor, nurses and pharmacists will likely be heavy on emotion: "We were just trying to alleviate acute suffering in the patients' last few minutes of life." Our emotional argument must be stronger…Our emotional argument should center around the following: Our first commitment as medical professionals is to do no harm, and that commitment must not be violated to alleviate acute suffering at the end of life. In fact we've taken great care to ensure that our end of life care allows patients to die peacefully, in dignity and comfort, without disrespecting the sanctity of life……While our position would be strengthened by an indictment(s), our argument must be able to stand on its own, regardless of what the Prosecutor does.

(Ex. 43 at JAR0004968).

145.    This formulation again highlighted the value of obtaining indictments to "strengthen" Defendant's message. The "Key Messages" section of the document stressed that "[t]he acts of this doctor, along with a small number of nurses and other clinical staff, were a clear violation of how we care for patients at Mount Carmel," again preparing to convince the public that the care of the patients actually violated a policy, when it did not. (Ex. 43 at JAR0004968).

146.    On December 21, 2018, Gallaway forwarded his colleagues the final version of the Lighthouse plan. (Final Strategy Plan (Ex. 45)).[2] In his cover message, Gallaway indicated, "We will use this as the foundation for all communications messaging and tactics. We do not plan to change these core messages unless the related facts or circumstances change." (Ex. 45 at JAR_0000549). Nothing changed.

147.    The Strategy section of the final plan stated:

> We will have a clear message that refutes people who say "The physician was just trying to alleviate acute suffering in the patients' last few minutes of life…. Our position must be able to stand on its own, regardless of whether the county prosecutor's work results in any indictment(s).

(*Id.* at JAR_0000551-52).

148.    Trinity's plan was to solicit indictments to reinforce its desired public message.

149.    Trinity was correct to presume that the nurses and Dr. Husel would take the position that their only intent was to alleviate pain *because Trinity had been told exactly that*.

150.     When Trinity was interviewing the nurses who worked with Dr. Husel and who cared for the patients at issue, every single one indicated that they did not intend to hasten any patient's death. As Dr. Roth, the corporate representative designated to testify on behalf of Mount Carmel and Trinity admitted:

> 128
> […]
> 12· · · · Q.· · No, it – well, we can talk about
> 13· ·that.
> 14· · · · · · · In your investigation on behalf of
> 15· ·the hospital, did anyone that provided the
> 16· ·clinical care to any of these patients at any
> 17· ·time, Dr. Husel, the nurses, the pharmacist tell
> 18· ·you they intended to hasten death?

[2] In her deposition, Curtis suggested the "final" plan was not the final plan because new information was obtained around January 1. She did not recall what the information was, and a February 2019 email forwarding the plan as the "final" version makes clear that the December 21 version was final. (TMCN0169988–994 (Ex. 46)).

19· · · ·A.· · Nobody told us they intended to
20· ·hasten patient death.
21· · · ·Q.· · And isn't it clear that they all
22· ·individually to the members said they did not?
23· · · ·A.· · To those that were interviewed, yes.
24· ·Not Dr. Husel to your point.
25· · · ·Q.· · Well, apparently he said it to
·3· ·Dr. Swanner.

129
[…]
·4· · · · ·A.· · Yeah, okay, fair enough.
·5· · · · ·Q.· · So that would be every person
·6· ·involved said they didn't intend it; would that
·7· ·be fair?
·8· · · · ·A.· · Yep.

(Roth Dep. (EX. 6)).

151.    Trinity did not care about this truth, because it contradicted Trinity's public

narrative of Trinity doing the right thing in the face of something sinister.

*Trinity Commissions a Second (Substantive) Review of Care, but Disregards/Disavows the Results*

152.    While the communication plans were being prepared, Dr. Daniel Roth went back

to Dr. Tocco-Bradley and asked her to review the full records of 25 patients. This time Dr.

Tocco-Bradley was given access to the patients' medical records. (Tocco-Bradley Dep. 97:12-

99:5 (Ex. 26)). Dr. Tocco-Bradley reviewed the medical records and created a spreadsheet to

track the information she deemed important. (Spreadsheet; Tocco-Bradley Dep. 102:20-103:9

(Ex. 47, Ex. 26)).

153.    She used this spreadsheet to create the second report. (Ex. 48). Her December 16,

2018 review concluded:

> After reviewing all 24 records, I believe that each patient was terminal and appropriate
> for DNAR status and ventilator wean. It is appropriate to provide medications such as
> morphine, fentanyl and versed to terminal patients who might experience agitation, acute
> respiratory distress or anguish close to the time of their death. I cannot say for sure why
> the given clinician chose to use such large doses of palliative medications but perhaps he

felt he was providing more humane pharmacologic support through the terminal stages of
dying. The dosing regimen he used, to my knowledge, is outside of typical standard of
care even for most terminal patients.

(Ex. 48).

154.    In her worksheet that evaluated the cases, Dr. Tocco-Bradley concluded that in

many cases the medications could cause death in an unventilated patient, but she did not

conclude that the use of the medications with the particular patients at issue actually had caused

or contributed to their deaths.

155.    Moreover, in 7 of the 24 cases, Dr. Tocco-Bradley concluded that she saw no

potential connection between the dosages used and the patients' survival time following

extubation. (Ex. 48). Dr. Tocco-Bradley testified unequivocally that none of the patients whose

records she reviewed could have survived but for the medication. (Tocco-Bradley Dep. 147:11-

16 (EX. 26)).[3]

156.    Ultimately, the result of Dr. Tocco-Bradley's review proved too equivocal for

Trinity.

157.    It was never provided to the prosecutors (though it was eventually produced by

Mount Carmel in response to a subpoena by Dr. Husel's criminal defense team).

158.    Defendant had already established their communications goals and strategies,

which were to work toward ensuring the Franklin County Prosecutor's Office indicted at least

William Husel and hopefully nurses and pharmacists, and to find a strong emotional angle to

---

[3] In her deposition, however, Dr. Tocco-Bradley explained that her only experience in terminal
withdrawals involved organ donors, where the withdrawal would be followed by an organ
harvest procedure, and required protocols specific to that procedure, given the need to preserve
the organ(s). Dr. Tocco-Bradley, an anesthesiologist, otherwise had no experience with ICU
terminal withdrawals where, as was the case with each of the 35 patients, the only clinical goal
was pain mitigation. (Tocco-Bradley Dep. 9:12-13:13, 24:13-25:9 (Ex. 26)).

counter the anticipated message from Dr. Husel and the nurses that they were just trying to alleviate acute pain. (See Exs. 40, 43, 35, 36, 45, 52)).

159.    Dr. Tocco-Bradley's speculation that "perhaps he felt he was providing more humane pharmacologic support through the terminal stages of dying" was certainly not "on-message."

160.    Dr. Roth testified that he was totally unaware of Dr. Tocco-Bradley's second report at the time and did not learn about it until the spring of 2022, during litigation, and that it was not used at all in connection with the investigation. (Roth Dep. 203:25-204:11 (Ex. 5)).

161.    However, Dr. Roth testified that the only analyses done of Dr. Husel's patient care and his dosing decisions were by Dr. Swanner, Dr. Moody, Dr. Tocco-Bradley and an outside group, Greeley Co. LLC. (Roth Dep. 162:5-20 (Ex. 5)).

162.    But Dr. Swanner clearly did not have the requisite expertise to conduct the analysis, as he made clear in his deposition.  Dr. Moody's advice to Dr. Swanner was also equivocal, in that she could understand why a patient would need higher doses, such as those Dr. Husel ordered due to tolerance, but thought it would be very infrequent.

163.    Dr. Tocco-Bradley's first report was only a high-level summary and only related to five patients but did not include any patient information, and Dr. Roth testified as the corporate representative of Trinity and Mount Carmel that her second report was not part of the investigation.

164.    As such, with respect to these "reports," none of them could be considered an actual investigation into the relevant events.

165.    Trinity commissioned another report, the Greeley report. However, the Greeley report was not received by Trinity until January 2, 2019, which was too late to inform

Defendant's decisions to make a report to the Franklin County Prosecutor, or, as discussed below, the decision to tell the family members of 26 patients on December 27, 2018 that their loved ones had been given medication that "likely shortened their time," (Ex. 41)) all of which had already occurred.[4]

166.     The Greeley report was demonstrably intended to be a post hoc justification of the actions Trinity had already taken and was paid for and used to buttress false information already given to the Franklin County Prosecutor. This additional "report" was employed as part of Trinity's efforts to procure an indictment of Dr. Husel, and perhaps others.

*December 27, 2018 – After Identifying More Than 50 Instances of Terminal Withdrawals Overseen by Dr. Husel Under Varying Circumstances, Defendants Decide to Call the Families of 26 of Those Patients and Provide False Information Regarding the Impact of Pain Medication Without Having Conducted Any Meaningful Evaluation of the Care*

167.     During the course of their investigation, Trinity and Mount Carmel ran five reports to identify patients cared for by Dr. Husel using varying parameters. (Dep. Ex. 66, McKibben Dep. 33:3-22 (Ex. 25, Ex. 19)). The reports were as follows:

| Date of Report | Parameters | Number of Patients Identified |
|---|---|---|
| 11/23/2018 | Patients that expired within 400 minutes of an order for 800 micrograms of fentanyl or greater | 14 |
| 11/26/2018 | Patients that expired within 400 minutes of an order for 500 micrograms of fentanyl or greater | 24 |
| 12/05/2018 | Patients that expired after an order for 500 micrograms of fentanyl or greater (no time limitation) | 40+ |
| 12/19/2018 | Patients that expired within 120 minutes of an order for 500 micrograms of fentanyl or greater or any dosage of fentanyl plus one of several other medications (6 mg of Versed, 20 mg of valium, 6 mg of hydromorphone, 100 mg of ketamine, 140 mg of propofol and any amount of paralytics in the 60 minutes prior to extubation. | 35 |

---

[4] In the related Ohio action, all documents regarding the Greeley report were withheld by Defendant, as Defendant claimed it was a privileged report that was commissioned and prepared at the direction of counsel and cannot be considered by the Court or a jury for any purpose. (Defendant' Privilege Log at 16 (Ex. 37)).

| 12/21/2018 | Patients that expired within 120 minutes of any dosage of one of several other medications in excess of the following: 500 micrograms of fentanyl, 6 mg of Versed, 20 mg of valium, 6 mg of hydromorphone, 100 mg of ketamine, 140 mg of propofol and any amount of paralytics in the 60 minutes prior to extubation. | 32 |

(Ex. 25)).

168.    On December 27, 2018, at the direction of the administration and Trinity, Mount Carmel clinical staff (including Dr. Ralston and Dr. Swanner) called the legal representatives (usually a family member) of 26 patients.

169.    In each case, the callers followed a script which explicitly set forth what could and should be said and what could not and should not be said. (Call Script; Ralston Dep. 115:3-117:23; Swanner Dep. 115:17-120:17 (Ex. 41, Ex. 3, Ex. 15). Deviation from the talking points were not permitted. (*Id.*).

170.    In no case did the caller have any personal knowledge of the care the patient had received, nor were the callers given any access to the medical records. (Ralston Dep. 113:25-114:13 (Ex. 3)).

The callers told each of the family members:

[I]t's likely the dose of pain medication further shortened his/her time. We are truly sorry this happened…Please know this is not how we deliver care at Mount Carmel…We reported our concerns to authorities, and investigators may be contacting you…the employees involved here have been removed from patient care….

(Ex. 41 at 5). The Mount Carmel representative who made the call had no idea whether their statements were true or not, and no way of finding out.  But Trinity knew these statements were false.

171.    The calls made on December 27, 2018, were the first time Mount Carmel made a public disclosure, though it was limited and temporarily discreet. However, Trinity was aware

that these disclosures would unquestionably lead to lawsuits, and well aware that the lawsuits would bring the entire story they had been preparing into the press and the public at large.

172.     Ultimately, Trinity and Mount Carmel released their press statements and pre-recorded videos on the same day that the first lawsuit was filed.

173.     Trinity was also aware (and intended) that the press coverage of the announcement and the lawsuits would pressure the Franklin County Prosecutor's office to take action against Dr. Husel.

174.     While the December 27, 2018 statements defamed Dr. Husel, the calls to families were a fire that Defendant (who was admittedly "desirous of disclosure" (Roth Dep. 208:6-209:19 (Ex. 5) deliberately lit to create an opportunity to launch their carefully crafted communications blitz (internally referred to in planning documents as "D-DAY") (See Dep. Ex. 40) (Ex. 50), aimed at ensuring that the public believe that Dr. Husel was a villain and the nurses and pharmacists were "co-villains" who had murdered at least 25 patients, and that they should be prosecuted for their crimes.

*Mount Carmel Leadership and Prosecutors Urge That Medications Not Be Publicly Described as "Fatal"; Trinity Leadership Refuses to Remove Term from Planned Statements, but Allows Revision to "Potentially Fatal"*

175.     Between late December 2018 and January 14, 2019, Trinity created and revised a script for a video that would be publicly released to the press and elsewhere, and another that would be released to 11,000+ Columbus-area employees of the Mount Carmel Health System.

176.     The videos were to be made public with a simultaneous release of written statements from both Mount Carmel and Trinity on a date referred to as "D-Day." (*Id*.). In all versions of the scripts and written communications through January 6, 2019, the medications were always described as "fatal" without modification. (See JAR_0000206-07 (1/6/19 draft

Gilfillan letter to all of Trinity) (Ex. 53), (Packet of 12/14/18 Draft Communications documents) (Ex. 40)).

177.    On January 8, 2019, Mount Carmel CEO Edward Lamb raised a concern about publicly using the term "fatal" when describing the doses. (Ex. 54). In an email to Bret Gallaway, Dr. Daniel Roth, and others, Edward Lamb asked: "Bret, do we need to say – 'and in most cases the doses were fatal?' Just thinking about the optics and consequences of saying that." Lamb would later urge in his deposition that he personally did not believe any crime had occurred. (Lamb Dep. 86:12-14 (Ex. 22)).

178.    Melissa Lander, the communications lead for Mount Carmel, also did not favor using the word "fatal." (Lander Dep. 124:2-127:10 (Ex. 34).

179.    Sixteen minutes later, Gallaway responded:

Thanks, Ed. Dan [Roth] and I discussed it this morning. Of the 27 cases, we are confident that the doses were fatal in 17 of the cases. Since that's more than half, we can say "most." If pressed by a reporter, we could say the number is "at least 14." We should say that a number of the doses were fatal, because that highlights one reason we are so concerned about these events. We say that life is sacred to us.

(Ex. 54)).

180.    During discovery in the Ohio case, Defendant was repeatedly offered an opportunity to produce, and in fact were demanded to produce, records supporting this statement. Trinity never did so. They failed to produce any record supporting this statement because in fact, there are no medical assessments or other documents that could even arguably support Mr. Gallaway's assessment of which cases Trinity was "confident" involved fatal doses.

181.    However, Ed Lamb and Melissa Lander were not the only people who were unsupportive of a public statement describing the doses as "fatal." According to contemporaneous notes taken on a January 13, 2019 call of senior management discussing the

term, one of the participants reported that the "[Franklin County] Prosecutor doesn't like fatal."

(Ex. 55).

182.    According to the same document, Richard Gilfillan, the Trinity CEO, was

ambivalent and could "go either way," but Bret Gallaway, Trinity's Head of Marketing and

Communications, "was pushing fatal." Ultimately the decision was made to modify the word

"fatal" with "potentially" (TCMN0178514 (Ex. 55)) in the public statements, while continuing to

state to the prosecutor's office that the doses were in fact fatal and Husel intended to cause the

death of 24 patients.

*January 14, 2019 – Defendant Releases First Fully Public Statements, Falsely Telling the Public that 26 Patients Received "Potentially Fatal" Dosages of Medication, Falsely Telling the Public That This Happened Because Hospital Staff Ignored Clear Policies and Safeguards, and Falsely Telling the Public That a Brave Employee Spoke Up as a Direct Result of a Safety Initiative That Had Been Implemented 18 Months Earlier*

183.    On January 14, 2019, at Trinity's direction, Mount Carmel made their long-

planned public announcement. The announcement was made via two videos released through

YouTube as well as written announcements from both Mount Carmel and Trinity.

184.    One of the videos was supposedly only for the 11,000 employees of Mount

Carmel, but it was soon disseminated to the public at large. A full transcript of the announcement

is attached. (1/14/19 Transcript (Ex. 56)). In pertinent part, the statements said the following to

the public:

> Mount Carmel recently reported to authorities, the results of an internal investigation regarding the care provided by a doctor who, until recently, worked with patients requiring intensive care. During the five years he worked here, this doctor ordered significantly excessive and potentially fatal doses of pain medication for at least 27 patients who were near death….

> On behalf of Mount Carmel and Trinity Health, our parent organization, we apologize for this tragedy, and we're truly sorry for the additional grief this may cause these families….

> As you can imagine, this tragic news has caused many tears and anguish throughout our Mount Carmel family…

(Ex. 56)).

185.     As anticipated and planned, the press reaction was swift. It picked up on all of the frames that Defendant sought to use, and the Defendant's control of the public narrative had started.

186.     In short, the announcement falsely stated that Dr. Husel had ordered medication that "potentially" killed 27 people, when in truth, the medication Dr. Husel ordered did not cause (or potentially) cause a single death, as Trinity knew when it directed the statement to be made.

187.     The statement also asserted that nurses and pharmacists who worked with him made poor decisions and "ignored" policies and safeguards, when there were no policies in place at all regarding the use of medications in connection with terminal withdrawals. Finally, the statement that "unintentional human error is not punished" made clear that anyone who ended up the subject of an adverse employment action acted with intent.

188.     The following day, Trinity directed Mount Carmel to release a statement to the press indicating "[o]ne of our foremost goals has been to fully cooperate with the prosecutor and other authorities," making clear to all of Columbus that there was a criminal investigation. (Ex. 57 at TCMN0009042).

189.     On January 22, 2019, Trinity directed Mount Carmel again to remind the public of the criminal investigation, and effectively invited the patients' families to initiate lawsuits, with a release stating:

> Based on what this doctor did to these near-death patients, we understand that some of these families may be considering legal action. We've apologized to these families, we've apologized publicly, and we're continuing to cooperate with law enforcement and other authorities.

(Ex. 57 at TCMN0009048).

*January 24, 2019 – After Press Coverage Wains, Defendant Falsely Claim to Have "Identified" Seven Additional Cases, When They Had Merely Revised Their Disclosure Parameters and Announced That They Are Considering Whether Any Patients Could Have Survived*

190.    On January 24, 2019, Trinity directed Mount Carmel to release another statement asserting:

> We have identified seven additional patients who received excessive doses of pain medication that Dr. Husel ordered. One of the patients received an excessive and potentially fatal dose. The other six patients received excessive doses that went beyond providing comfort but were likely not the cause of their deaths. We contacted the loved ones of these patients because it was the right thing to do. This brings the number of patients involved to at least 34, and we anticipate we might discover more as our investigation continues.

(Ex. 44).

191.    This statement asserted several falsities. By stating that six of the seven "newly identified" cases involved medication that was "likely not the cause of their deaths," Trinity reinforced their statements that the medication was the cause of 28 deaths. This was false.

192.    In addition, there was nothing newly discovered to announced, as all of the patients had been identified on the internal reports Defendant had run the previous month. (Parameter Reports; Roth Dep. 323:5-7 (Ex. 25, Ex. 5)).

193.    In addition, to inject further hysteria into the frenzy Trinity directed Mount Carmel to elicit from the press, the statement added:

> We are investigating whether Dr. Husel ordered excessive doses of medication when there was still opportunity to explore if there were reversible causes of patients' immediate conditions.

(Ex. 44).

194.    As Trinity's representative witness regarding the press statements admitted, this statement indicated (falsely) that there was a concern that some of the 35 patients were not terminally ill and could have been saved but for the administration of "lethal" doses of medication.

141
[…]
10· ·Q· · · What does that mean?
11· ·A· · · Just what it says.· I guess I don't understand what
12· · · · · you're asking.
13· ·Q· · · Well, I read that as the, Mount Carmel was looking
14· · · · · into whether there were patients who were given fatal
15· · · · · doses of medication who otherwise might have survived.
16· · · · · Is that what it was intended to mean?
17· ·A· · · Yes.

(Lander Dep. Ex. 34)).

195.    As they had with the January 14, 2019 release, both Dr. Daniel Roth and Edward

Lamb met with reporters for the Columbus Dispatch in advance of the announcement (Lander

Dep. 140:9-19 (Ex. 34)) to ensure that the message was conveyed and understood as Trinity

intended.

*February 22, 2019 – Defendant Falsely Claim to Have Identified Five Cases Where Patients*
*Might Have Survived*

196.    On February 22, 2019, Trinity directed Mount Carmel to issue what may have

been their most damaging false statement: that five patients were not terminally ill and could

have survived but for the medication they received. Specifically, on February 22, 2019,

Defendant—knowing that it was patently false—publicly stated:

> As previously shared, we also have been investigating whether any of the affected
> patients received excessive doses of pain medication when there was still an opportunity
> for treatment to improve their immediate condition. We are aware of five cases in which
> this possibility is a concern, and we are reaching out to the loved ones of these patients to
> share this information.

(Ex. 58).

197.    Again, to remind the public that the county prosecutor was investigating, the

release added, "Our internal investigation is ongoing, and we continue to share information and

cooperate fully with authorities, including law enforcement." (*Id.*).

44

198.     However, despite repeated demands, Defendant in the Ohio action were unable to produce in discovery any document that indicated the identity of the five patients identified in the February 22, 2019 disclosure that Trinity falsely stated could have survived but for the fatal dose of fentanyl prescribed by Dr. Husel.

199.     Trinity's corporate representative regarding the investigation, Dr. Daniel Roth, could only guess as to the identity of three of them and said, "I don't think they [the names] were specifically recorded." (Roth Dep. 376:24-377:20, 377:2-378:5 (Ex. 5)).

200.     One of the three was a patient who had, in fact, entered the hospital without a life-threatening condition but died, nonetheless. That patient had undergone a liver biopsy that led to complications which ultimately caused her death.

201.     As such, while actions taken at Mount Carmel did cause her death, those actions occurred long before the patient was transferred to the ICU, when it was too late. (Downs Dec. ¶ 23 (Ex. 8)). Dr. Roth admitted that the patient appeared to die of complications from a procedure (Roth Dep. 379:4-6 (Ex. 5)), notwithstanding his having directed the public statement that this patient could have survived.

202.     Indeed, the trajectory of the February 22 disclosure started with a draft from January 17 (Ex. 59), which, unlike the final product, candidly admitted that any hospital-caused/avoidable complications that led to the five patients' deaths were unrelated to the care the patients received in the ICU.

203.     But the February 22 disclosure, in context, sent the clear message that the ICU—not the area of the hospital where the avoidable complication occurred—not just could have prevented these deaths, but gave "potentially fatal" doses of medication instead. However, these patients' conditions had become terminal and irreversible *before* they were transferred to the

ICU—a fact that Trinity was well aware of prior to making the false public statement for the purpose of seeking an indictment of Dr. Husel.

204.    In the evening of February 22, 2019, Bret Gallaway sent a congratulatory email to Trinity and Mount Carmel senior leadership, exclaiming: "Kudos to Melissa Lander and Samantha Irons for leading this effort and influencing the Dispatch coverage. We'll track other local and national coverage and discuss during our 4pm call today." (Ex. 60). The article, titled "Mount Carmel says 5 patients may have survived with proper care," stated that this information had been supplied by Dr. Daniel Roth, and quoted Edward Lamb as saying:

> I hope that as we continue to go down this road that the community understands how devastated we are about all of this…And certainly we realize that we've lost the trust of our community, and we're working on trying to do everything we can to rebuild that.

(E1. 51).

205.    Nothing in the article would even suggest to readers that the lack of "proper care" occurred before the patients reached the ICU.

206.    On February 28, 2019, the aspect of Trinity's campaign that was to elicit an indictment, and to legitimize their core message with the imprimatur of the Franklin County Prosecutor, bore its first fruit.

207.    Having falsely told the public that five patients could have survived but for Dr. Husel's fentanyl prescription, and with Trinity pushing for Dr. Husel's indictment, the prosecutor was compelled to release a joint statement with the Columbus Police Department to announce that they were "vigorously working" on an investigation, but there was a substantial amount of work left to be done. (Ex. 61).

208.     In response, Trinity directed Mount Carmel to immediately enforce their message

again, with a fully reiterative statement calling attention to the Franklin County Prosecutor. The

release stated:

> We appreciate the candor of the Franklin County Prosecutor's Office and the Columbus
> Division of Police as well as their ongoing commitment to pursuing justice. The deaths of
> patients under the care of Dr. William Husel are tragic. The facts of these cases are
> complex, and the ongoing nature of the investigation means that new information can
> continue to surface. The total number of patients involved is at least 35. There were 29
> patients who received potentially fatal doses of medication. The other six patients
> received excessive doses that went beyond providing comfort but it was likely not the
> cause of their deaths.

(Ex. 57 at TMCN0009067).

209.     That day, Bennett Haeberle of CBS-affiliate Channel 10 reported, "One of the

main questions I get from viewers is 'why has no one been charged in this case?' The short

answer: authorities say they still have a lot of work to do." (Available at

https://www.10tv.com/article/news/local/prosecutors-police-vigorously-working-investigation-

former-mount-carmel-doctor/530-aa0ba73e-c4db-4343-8fe4-81df28aef4e3).

210.     Haeberle's reporting made clear that the public had already been convinced a

crime occurred, even though the criminal authorities had yet to say a word on the topic. A law

professor from Ohio State University interviewed on the program explained that one of the likely

reasons for the delay was that authorities needed to determine *how many* people to charge for the

murders.

211.     On March 8, 2019, Defendant again repeated itself to the public, in a release that

urged:

> We recognize that this tragedy involving Dr. Husel has affected how some people view
> Mount Carmel. We have been and will continue to work every day to ensure something
> like this never happens again.

(Ex. 57 at TMCN0009070).

*June-July 2019 – Dr. Husel Indicted; Defendant Immediately Prepare Final Disclosure and Conclude "Project Lighthouse"*

212.    On June 5, 2019, the Franklin County Prosecutor indicted Dr. Husel on 25 counts of murder. In a press conference that day, Franklin County Prosecutor Ron O'Brien stated that on December 5, 2018, representatives of Mount Carmel had contacted him with an urgent request to meet that same day. At the meeting, O'Brien explained that Mount Carmel representatives told him that:

> Dr. Husel had been administering doses of fentanyl at a level that they internally believed were inappropriate, and not for a legitimate medical purpose, and which they also believed were designed to hasten the death of the patients who were being treated.

(Available at https://www.youtube.com/watch?v=qnwz9cBy3Ic; 6-5-19 Transcript (Ex. 60)). At the same press conference, Columbus Chief of Police Quinlan explained:

> A significant challenge unique to this investigation is that detectives needed to familiarize themselves with medical records' terminologies, practices and procedures in order to understand the difference between treatment and criminal activity. This challenge was met with the support of … the extraordinary cooperation provided by Mount Carmel Health Care.

(*Id.*).

213.    After Chief Quinlan spoke, Mr. O'Brien returned to the podium to reiterate his appreciation for the assistance and support provided by Defendant, and especially praised "Dr. Roth from Trinity." (*Id.*).

214.    Having obtained exactly what their public relations campaign sought to obtain— Dr. Husel's indictment—Trinity promptly issued a statement to the press:

> We appreciate the County Prosecutor's leadership and his ongoing commitment to justice in this case. Following the discovery of the actions of Dr. Husel, we notified appropriate authorities, including law enforcement. We have shared information with them and will continue to fully cooperate throughout their investigation.

(Ex. 57 at TMCN0009090).

215.     Therefore, on June 5, 2019, Defendant had obtained the "helpful" indictment(s) they sought to procure to buttress their "stronger" emotional message designed to counter any argument that the nurses and Dr. Husel were "just trying to alleviate the acute pain of dying." With the pressure campaign having achieved its goal, Defendant immediately began to dismantle the apparatus they had put in place, end the supposedly "ongoing" investigation, prepare one last press release, and terminate almost every member of the ICU staff on leave after having claimed to have followed a "Just Culture" process.

216.     On June 11, 2019, less than a week following the indictment, at Defendant's request, Jarrard produced an "announcement planning" with respect to "Internal Investigation Conclusion [and] Colleague Decisions." (Final Announcement Plan; Lander Dep. 153:12-154:12 (Ex. 62, Ex. 34)). The draft plan made clear that the announcement of terminations (of Plaintiff and others) was not awaiting the result of any investigation, but rather awaiting the announcement of an indictment, which had finally arrived. This was done, presumably, so that Defendant could maintain leverage over the employees on leave until the conclusion of their public campaign—both to ensure cooperation and to silence any inconsistent messages while the prosecutor mulled the indictments Defendant desired.

217.     In December 2019, Husel commenced a lawsuit against Mount Carmel and Trinity alleging defamation, and breach of a contract that required his legal fees to be paid. At the time, this cause of action had not yet accrued, nor was Dr. Husel aware of the extent of Trinity's involvement and control of its subsidiary's (Mount Carmel's) conduct.

*Prosecution Drops 11 Counts of the Husel Indictment; During Trial, Columbus Police Testify That the Decision to View Husel's Actions as a Crime Was Based Exclusively on What Defendant Told Them; and the Jury Acquits Husel of All Remaining Counts*

218.         On January 20, 2022, the Franklin County Prosecutor filed a motion to dismiss eleven of the twenty-five murder charges. (See

https://www.10tv.com/article/news/investigations/10-investigates/mount-carmel-patient-overdose-deaths/husel-murder-counts-dropped/530-dddcf3f0-5719-40e6-9ccc-0b7e8b6feadd).

219.    At the trial, the lead detective on the case, William Gillette, testified that neither the police nor the prosecutor had any outside knowledge on whether the dosages at issue may have been given for a purpose other than hastening death, and claimed that all of key information came from Defendant. As the lead detective for the Columbus Police testified on February 22, 2022:

> The State was able to get experts, and one of them was Dr. Roth, who works with Trinity, which is part of Mount Carmel, and he was able to go through and look at some of the charts and once they got everything, the medical records, and then they put together a list of victims that they wanted us looking into.

(Available at https://www.youtube.com/watch?v=KrLHeXfGwh0 (4:18:50)).

220.    The Prosecutor's statements to the press along with the testimony of Detective Gillette make clear that the element of probable cause with respect to both Dr. Husel's intent as well as the impact of his care was supplied by Dr. Roth and Trinity, the entity that was seeking to procure Dr. Husel's indictment.

221.    As such, the grand jury's finding of probable cause to indict Dr. Husel of each of the 25 counts of murder was based upon false information provided by Trinity.

222.    On April 20, 2022, a Columbus jury acquitted Dr. Husel of all charges.

223.    A few weeks later, Dr. Husel voluntary relinquished his license to practice medicine. Dr. Husel understood that, notwithstanding the acquittal, the reputation damage he endured would prevent him from ever working as a doctor. As such, he agreed with the Ohio Board of Medicine that he had failed to cooperate in their investigation of him during the pendency of the criminal investigation and prosecution by asserting his Fifth Amendment rights.

224.    Husel, through his counsel, agreed that although he was only exercising a constitutional right under the Fifth Amendment, doing so precluded him from cooperating and violated administrative mandates that required him to do so as a condition of his licensure.

225.    Since his acquittal, Dr. Husel has been diagnosed with post-traumatic stress disorder and major depressive disorder. He has not been able to obtain employment and has looked after his children while his wife works.

226.    Since the indictment, Dr. Husel has developed physical symptoms that are not related to any injury or otherwise explainable including a loss of mobility in one leg (resulting in a limp) and a loss of fine motor control in his hands, which impacts his ability to write, eat, dress and conduct many of the other ordinary activities of life without a struggle.

227.    He is receiving treatment for the trauma and trying to recover.

## SOLE CAUSE OF ACTION

### Malicious Prosecution

228.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs as though fully set forth herein.

229.    Trinity actively sought the indictment and prosecution of Dr. William Husel by the Franklin County Prosecutor's Office and provided knowingly inaccurate and misleading information and knowingly withheld material relevant information tending to prove no crime was committed to procure an indictment against Dr. Husel.

230.    Trinity actively sought the indictment and prosecution of Dr. William Husel by the Franklin County Prosecutor's Office in order to support Trinity's and Mount Carmel's public image as defenders of the "sanctity of live" and as institutions that "do the right thing" while directing public scorn at Husel in a manner that would benefit their public image.

231.    Relying on Trinity as a reliable and impartial purveyor of medical information, Franklin County Prosecutor's Office presented the inaccurate information including incorrect medical opinions provided by Trinity to a grand jury and secured a 25-count murder indictment against Dr. Husel based on such information.

232.    11 of the 25 counts were voluntarily dismissed by the Franklin County Prosecutor's Office and Dr. Husel was acquitted of the remaining 14.

233.    Because the medical information provided by Trinity was baseless, probable cause for the indictments was lacking.

234.    Trinity's primary purposes were to distract the public from its own administrative failings and/or to support a restrictive/religiously based approach to end-of-life medicine that is not consistent with accepted medical standards by equating non-Catholic views on the "sanctity of life" with homicide.

235.    Trinity's primary purpose was not to bring an offender to justice.

236.    Because of Trinity's malicious (and successful) campaign to secure Dr. Husel's indictment, William Husel was gravely damaged, and has economic, physiological, and physical harm as a result of Trinity's action above and beyond any damages caused to him simply by Trinity's defamation of him in the public arena.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      On the SOLE cause of action, such actual damages as Plaintiff may prove at trial but in an amount no less than $20,000,000 dollars in actual damages, plus treble damages and reasonable attorney's fees (reduced by any amount he may obtain in connection with other litigation pending in the Franklin County (Ohio) Court of Common Pleas since 2019); and

B.      Any further and other relief the Court deems just and proper.


Dated:  April 12, 2023
        New York, New York


                        FORD O'BRIEN LANDY LLP



                         s/Robert S. Landy
                        Robert S. Landy
                        Adam C. Ford
                        275 Fifth Ave.
                        24th Floor
                        New York, New York 10016
                        (212) 256-1047 (direct)
                        (212) 858-0040 (main)
                        rlandy@fordobrien.com



                        *Counsel for Plaintiff Dr. William Husel*

## INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---|---|
| 1 | Trinity Withdrawal of Motion to Seal |
| 2 | William Husel Declaration |
| 3 | David Ralston Deposition Excerpt |
| 4 | Beth Macioce-Quinn Deposition Excerpt |
| 5 | Daniel Roth Deposition Excerpt |
| 6 | Article by Dr. Elaine Chen |
| 7 | Rebecca McNeil Deposition Excerpt |
| 8 | Jon Downs Declaration |
| 9 | 2014 Palliative Ventilator Withdrawal Policy |
| 10 | 2017 Palliative Ventilator Withdrawal Policy |
| 11 | CDC Guidance on Opioid Prescribing |
| 12 | Medical Administration Policy |
| 13 | Randy Miles Deposition Excerpt |
| 14 | VOICE Reporting Policy |
| 15 | Larry Swanner Deposition Excerpt |
| 16 | Kathryn Barga Deposition Excerpt |
| 17 | K. Barga VOICE Report |
| 18 | November 19, 2018 Email |
| 19 | Sean McKibben Deposition Excerpt |
| 20 | November 21, 2018. Email |
| 21 | November 26, 2018 Dr. Swanner "Note to Chart" re: Meeting with Dr. Husel |
| 22 | Edward Lamb Deposition Excerpt |
| 23 | Incident Timeline |
| 24 | November 29, 2018 Dr. Swanner Notes |
| 25 | Reports |
| 26 | Rosalie Tocco-Bradley Deposition Excerpts |
| 27 | December 3, 2018 Dr. Tocco-Bradley Report |
| 28 | June 5, 2019 News Conference Transcript |
| 29 | Notes from Just Culture Committee Meeting |
| 30 | Maggie Curtis Deposition Transcript |
| 31 | December 8, 2018 National Communications Plan Draft |
| 32 | Earlene Romine Deposition Excerpt |

| 33 | December 7, 2018 Petition to Reinstate Husel |
| 34 | Melissa Lander Deposition Excerpt |
| 35 | Draft Strategy Memo |
| 36 | December 10, 2018 Email |
| 37 | January 28, 2022 Trinity Privilege Log |
| 38 | February 7, 2019 Lighthouse Phase 2 Communication Plan |
| 39 | Article in "Chest" |
| 40 | December 15, 2018 Email |
| 41 | Lighthouse Process Overview and Script |
| 42 | December 18, 2018 Outreach to Patient Families Plan |
| 43 | December 19, 2018 Email |
| 44 | January 24, 2019 Media Statement |
| 45 | December 21, 2018 Email |
| 46 | February 7, 2019 Email |
| 47 | December 16, 2018 Spreadsheet |
| 48 | December 16, 2018 Dr. Tocco-Bradley Report |
| 49 | Brandi Wells Deposition Excerpt |
| 50 | "Villain Victim Vindicator" Analysis |
| 51 | Columbus Dispatch Article |
| 52 | December 19, 2018 Trinity Health Communication Plan and Playbook |
| 53 | January 6, 2019 Draft Letter |
| 54 | January 8, 2019 Email from E. Lamb discouraging the use of the term "fatal" with B. Gallaway response indicating Trinity's desire to use it |
| 55 | January 13, 2019 Handwritten Internal Meeting Notes |
| 56 | January 14, 2019 Mount Carmel Announcement Transcript |
| 57 | Mount Carmel Media Statements |
| 58 | February 22, 2019 Media Statement |
| 59 | January 17, 2019 Media Statement Draft |
| 60 | February 22, 2019 Email Congratulating Staff on "influencing" Columbus Dispatch Coverage |
| 61 | February 28, 2019 Joint Media Statement |
| 62 | June 11, 2019 Announcement Planning |