# EXHIBIT 5

```
 1        CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

 2             UNITED STATES DISTRICT COURT

 3              SOUTHERN DISTRICT OF OHIO

 4                   EASTERN DIVISION

 5

 6   REBECCA MCNEIL, BETH MACIOCE-

 7   QUINN, EARLENE ROMINE, EDWARD

 8   WRIGHT, BRANDI WELLS, AKEELA

 9   BOWENS, AMELIA POWERS, CHAD

10   READOUT, JESSICA SHEETS, and

11   DERON LUNDY,

12

13             Plaintiffs,

14

15   -vs-                    Case No. 2:20-cv-258

16

17   MOUNT CARMEL HEALTH SYSTEM,

18   TRINITY HEALTH CORPORATION,

19   and EDWARD LAMB,

20             Defendants.
     _____/
21
             DEPOSITION OF DANIEL ROTH, M.D.
22
                   July 22, 2022
23

24   Reported by:  Pamela Moceri

25   Job No. 214523
```

1             CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

2                DANIEL ROTH, M.D.

3      A.     I do.

4      Q.     And what is his speciality?

5      A.     Palliative care.

6      Q.     So many patients from the ICU go to

7 palliative care afterwards; would that be fair?

8      A.     Yeah.  I mean define "many," but it's

9 not uncommon.

10      Q.     Okay.  "To develop an order set that

11 could be adopted as a policy and used as a

12 standard in these situations by all physicians

13 of the ICU."

14         So is it your knowledge that there

15 was an order set existing at that time for

16 palliative vent withdrawals that existed in the

17 Mount Carmel system?

18      A.     There was.

19      Q.     There was?

20      A.     It's called a power plan.

21      Q.     Was it mandatory?

22      A.     It was not.

23      Q.     Well, it seems that Dr. Ralston

24 didn't know that the order set was there because

25 he's talking about developing one.

```
 1              CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

 2                        DANIEL ROTH, M.D.

 3                  Do you know if he was aware of a

 4    power plan that you say existed in the Mount

 5    Carmel system for palliative vent withdrawal in

 6    October and November of 2018?

 7         A.    I don't know what Dr. Ralston knew at

 8    that time.

 9         Q.    Do you know if Dr. Swanner knew?

10         A.    I don't know what Dr. Swanner knew on

11    November 26th.

12         Q.    Do you know if there was a policy

13    that was in place for palliative vent

14    withdrawals that required the power plan be used

15    during the time of October and November of 2018

16    during palliative withdrawals at Mount Carmel?

17         A.    I don't believe it was a policy that

18    mandated the use of the power plan on

19    November 26th, if that was your question.

20         Q.    Yes, that is.  Dr. Husel was

21    supportive of the concept and agreed he would be

22    part of a group that would draft such an order

23    set.

24                  Do you know if Dr. Husel ever worked

25    with the group to draft such an order set?
```

```
1              CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

2                      DANIEL ROTH, M.D.

3         Q.    Working with him to change his

4    prescribing habits.

5         A.    I wasn't directly involved.  I mean,

6    first of all, November 26th I didn't know about

7    it.

8         Q.    During your investigation you said

9    this information was brought to you, correct?

10        A.    After the fact.

11        Q.    After the fact.

12        A.    Yes.

13        Q.    Did the investigation consider how

14   best to work with Dr. Husel to modify his

15   practice in order to make it more similar to

16   other physicians?

17        A.    No, not that I remember.

18        Q.    So it was never considered?

19        A.    I mean I suppose it was considered.

20   Obviously it didn't win the day.  I don't know

21   that I directly recall my notion of that

22   consideration specifically.

23        Q.    Well, Dr. Husel was well liked by the

24   staff at this point in 2018, correct?

25        A.    To my understanding.  I mean, define
```

```
 1              CONFIDENTIAL FOR ATTORNEYS' EYES ONLY
 2                      DANIEL ROTH, M.D.
 3       "well liked."
 4           Q.    He was physician of the year in 2015;
 5       is that correct?
 6           A.    Yes.
 7           Q.    And he was awarded physician of the
 8       year in 2018 until it was withdrawn because of
 9       these matters; isn't that correct?
10           A.    I believe that's correct.
11           Q.    So would you agree with me that he
12       was well liked if he's considered physician of
13       the year?
14           A.    Sure.
15           Q.    And there was no consideration of
16       working with him to bring him back; is that
17       correct?
18           A.    That wasn't the final decision.
19           Q.    Was there any consideration?
20               MR. O'SHEA:  Object.  Asked and
21           answered.
22               THE WITNESS:  I don't think so.
23       BY MR. GRAFF:
24           Q.    I'm going to turn your attention to a
25       document that's previously been identified as
```

```
 1            CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

 2                      DANIEL ROTH, M.D.

 3         A.     No, because once there -- you're

 4    going to get to this -- but once there was a

 5    consideration that it was potentially a crime,

 6    that's outside of the scope of our

 7    investigation.  We don't do criminal

 8    investigations.

 9         Q.     Wait a minute.  We're still doing

10    inside the hospital.

11         A.     But it's relevant.

12         Q.     No, it -- well, we can talk about

13    that.

14                In your investigation on behalf of

15    the hospital, did anyone that provided the

16    clinical care to any of these patients at any

17    time, Dr. Husel, the nurses, the pharmacist tell

18    you they intended to hasten death?

19         A.     Nobody told us they intended to

20    hasten patient death.

21         Q.     And isn't it clear that they all

22    individually to the members said they did not?

23         A.     To those that were interviewed, yes.

24    Not Dr. Husel to your point.

25         Q.     Well, apparently he said it to
```

```
 1            CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

 2                    DANIEL ROTH, M.D.

 3    Dr. Swanner.

 4         A.    Yeah, okay, fair enough.

 5         Q.    So that would be every person

 6    involved said they didn't intend it; would that

 7    be fair?

 8         A.    Yep.

 9         Q.    Did you consider that?

10         A.    Yes.

11         Q.    But you felt that that consideration

12    didn't outweigh your belief; would that be fair?

13         A.    Belief as to what conclusion?

14         Q.    As to what they did.

15              MR. O'SHEA:  Objection.  Are you

16         talking about what they did or what they

17         intended to do?

18    BY MR. GRAFF:

19         Q.    Well, they all said they intended not

20    to hasten death, correct?  Did you believe their

21    intent was not accurately portrayed?

22         A.    Well, if I didn't believe it, right,

23    then that consideration is a criminal one,

24    right.  Our investigation was not a criminal

25    investigation.
```

```
 1            CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

 2                    DANIEL ROTH, M.D.

 3              MR. O'SHEA:  You asked him whether

 4         there the power plan was mandatory.

 5    BY MR. GRAFF:

 6         Q.    Is there a maximum dose?

 7         A.    I'd be speculating.  I'm not going to

 8    speculate.

 9         Q.    Well, your testimony on the stand

10    under oath in Dr. Husel's trial was that in none

11    of the 88 hospitals there was a maximum dose for

12    palliative withdrawals.  Are you changing that

13    testimony now?

14         A.    That's not the question you asked, so

15    no.  The answer to your question is no.

16         Q.    Was there ever a maximum dose for

17    palliative vent withdrawals in any policy in any

18    one of your 88 hospitals during the relative

19    period of time of October and November of 2018?

20         A.    Can you restate it more slowly,

21    please?

22         Q.    Sure.  Of all of your hospitals in

23    the Trinity system during October and November

24    of 2018 --

25         A.    Yes.
```

1        CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

2                    DANIEL ROTH, M.D.

3        Q.     -- was there any maximum dose for a

4    palliative withdrawal?

5        A.     No, I don't believe so.  All of the

6    hospitals, no.

7        Q.     None of them?

8        A.     No, that's correct.

9        Q.     Not even in the Trinity power plan?

10       A.     I don't know that that's true.

11       Q.     Was there ever one prior?

12       A.     I don't know the answer to that

13   question.

14       Q.     Is there one now?

15       A.     There are order sets that provide

16   ranges, and there are reviews if they are to be

17   exceeding that.  Does that answer your question?

18       Q.     Yes.  And those were part of the new

19   policies and power plans that were put in either

20   at the end of 2018 or the beginning of '19,

21   right?

22       A.     That's correct.

23       Q.     But your testimony there was no

24   maximum dose policy at that time for palliative

25   withdrawals in October and November of '18?

1      CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

2                DANIEL ROTH, M.D.

3      A.    I'm not sure what you mean.

4      Q.    When they had the conversation, did

5  they come to some collaborative agreement?

6      A.    Yeah.  I mean the doses were given,

7  so yeah.

8      Q.    So were there any VOICE reports of

9  concerns or adverse events against Dr. Husel

10  about his prescribing in the ICU for palliative

11  withdrawal prior to October of 2018?

12      A.    There were no VOICE reports.

13      Q.    Were there any reports by any

14  management personnel of his prescribing of being

15  a concern in the ICU during palliative

16  extubations prior to October of 2018?

17      A.    Management personnel?

18      Q.    Anyone.  Pharmacy?

19      A.    Yes.

20      Q.    And where would we find those?

21      A.    There's an email from the pharmacy

22  team at Mount Carmel West.  June of 2018, if

23  memory serves.

24      Q.    And was Dr. Husel made aware of the

25  concern?

```
 1              CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

 2                        DANIEL ROTH, M.D.

 3         A.      Not to my knowledge.

 4         Q.      Was pharmacy -- how did pharmacy

 5   react to that email?

 6         A.      Nobody reacted to that email.  It was

 7   not by email.  Not to my knowledge.

 8         Q.      What did the facility do?

 9         A.      Nobody responded to it so nothing

10   happened.

11         Q.      So Dr. Husel was sent that email?

12         A.      No.

13         Q.      So how would Dr. Husel know?

14         A.      Your question was --

15         Q.      I understand that.  How would

16   Dr. Husel know?

17         A.      He would not.  That wasn't your

18   question.

19         Q.      Did anyone talk to Dr. Husel about

20   it?

21         A.      No.  Prior to November 26th, no.

22         Q.      Prior to November the 26th.

23         A.      No.

24         Q.      So he would have no knowledge that

25   there was a concern raised; would that be fair?
```

1          CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

2                    DANIEL ROTH, M.D.

3          Carmel versus the criminal process?

4     BY MR. GRAFF:

5          Q.    Which experts did you consult, how's

6     that, as part of your investigation?

7          A.    So we worked with -- well, a few.  So

8     one is Dr. Tocco-Bradley.  We already talked

9     about Dr. Moody, Dr. Ralston, then we used an

10    outside group.

11         Q.    And who was that?

12         A.    The outside group?

13         Q.    Yes.

14         A.    Can I answer that?

15               MR. O'SHEA:  You can answer.

16               THE WITNESS:  Greeley.

17    BY MR. GRAFF:

18         Q.    Tocco-Bradley, Greeley.

19         A.    Ralston, Moody, Tocco-Bradley,

20    Greeley.

21         Q.    Sorry.

22         A.    You're good.

23         Q.    Would you agree with me that that

24    standard of care is very patient specific?

25         A.    Yeah.

```
 1              CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

 2                      DANIEL ROTH, M.D.

 3     setting, because I wear a number of hats in this

 4     chair.

 5          Q.     Trinity.

 6          A.     Okay.

 7          Q.     When did Trinity higher an outside

 8     communications company?

 9          A.     So Trinity hired Jarrard, I want to

10     say, it was in the middle of December.

11          Q.     Did you ask Bret Gallaway to get a

12     relationship begun with Jarrard?

13          A.     Yes.  I don't know that I personally

14     did, but again, I'm saying what "you" means.

15          Q.     I'm kind of using the royal "we."

16          A.     The royal "we" did.

17          Q.     And that's really Jarrard, Phillips,

18     Kate and Hancock, correct?

19          A.     Yes.

20          Q.     We'll just call them Jarrard.

21          A.     Thank you.

22          Q.     Had you previously worked with

23     Jarrard?

24          A.     I had not.

25          Q.     Do you know if Mount Carmel had
```

```
 1              CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

 2                      DANIEL ROTH, M.D.

 3    BY MR. GRAFF:

 4         Q.    Have you seen this document before?

 5         A.    Yes.

 6         Q.    Have you seen this spreadsheet that

 7    was attached to it?

 8         A.    I'm sorry.

 9         Q.    Probably not in that form, or you may

10    have, I don't know.

11         A.    I don't know that I've seen this one

12    before.

13         Q.    For the record, I will --

14         A.    Go ahead, I'm sorry.

15         Q.    I will posit that Dr. Tocco-Bradley

16    notified us that that was a document that she

17    made.

18         A.    I have no reason to doubt that.

19         Q.    Okay.  When were you provided

20    Exhibit 16, do you know?

21         A.    Somewhere around the spring of 2022.

22         Q.    You never saw it when it was done in

23    2018?

24         A.    Correct.

25         Q.    Now, it has on here Mandi Murray,
```

1         CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

2               DANIEL ROTH, M.D.

3   Rick Streck, Tammy Lundstrom.  That was not

4   provided to you at that time, to the best of

5   your knowledge?

6       A.    Correct.  It may have been late in

7   2021, but not at that time.

8       Q.    Was this not used as part of your

9   investigation?

10      A.    Because I didn't know about it, it

11   couldn't have been used.

12      Q.    So do you know of anyone who was part

13   of the investigation -- I thought Dr. Lundstrom,

14   Dr. Streck, and I don't know about Mandi Murray

15   were part of the investigation, they didn't

16   bring this information --

17      A.    Correct.

18      Q.    -- to the committee for its review?

19      A.    Correct.

20      Q.    It would seem to me that that would

21   be a very critical, significant loss for

22   Dr. Tocco-Bradley's report not to be made

23   available to the committee.

24           Can you think of any reason why

25   either Dr. Lundstrom or Dr. Streck would hold it

1        CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

2                  DANIEL ROTH, M.D.

3        Q.    When was the first time that you met

4   with Ronald Ryan, the Franklin County

5   prosecutor, and his staff?

6        A.    It was -- I'll just look it up.

7   December 17th.

8        Q.    Were you physically in Columbus at

9   that time?

10       A.    Yes.

11       Q.    Is that about the time you started --

12       A.    Yes, that the first week.

13             MR. LANDY:  Finish that question.

14   BY MR. GRAFF:

15       Q.    Spending significant time in

16   Columbus?

17       A.    Yes, that was the first time I came

18   down, as a matter of fact.

19       Q.    And you met with yourself, general

20   counsel for Mount Carmel; that would be Dan

21   Hackett?

22       A.    That's correct.

23       Q.    Your outside counsel; that would be

24   Greg Peterson?

25       A.    That's correct.

```
 1            CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

 2                      DANIEL ROTH, M.D.

 3         Q.     Who is the VP of strategy and

 4    planning?

 5         A.     Brett Justice.

 6         Q.     Is there a reason why your

 7    communications or strategy person would have met

 8    with the police on such a matter?

 9         A.     Yes.

10         Q.     What would that be?

11         A.     So one of the main reasons if not the

12    primary reason why we went was we, "we"

13    Mount Carmel and Trinity right, were desirous of

14    disclosing what we had discovered so far to the

15    family members.  The police department and the

16    prosecutors' office had asked us to not do that

17    until they may have had the opportunity or

18    figured out if they wanted to interview the

19    family members or not, and so we didn't want to

20    do that and run afoul of their direction or

21    interfere with their work, so we were mostly

22    seeking to establish a timeline in which we

23    could have those conversations with the family

24    members.

25         Q.     Now, you decided to meet with the
```

```
 1              CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

 2                      DANIEL ROTH, M.D.

 3    prosecutor.  How long were you there?

 4         A.    I think about an hour.

 5         Q.    Did they give you details of where

 6    they had already done their interviews and had

 7    completed them?  What happened?  You tell us.

 8         A.    My recollection of what happened is

 9    we had a conversation about work we were doing,

10    you know, to expand on trying to understand how

11    many people were impacted, one.  The gist of or

12    the thrust of the meeting was what we would tell

13    family members, why we were desirous of telling

14    family members, and I think they shared some of

15    what they had heard through the investigation to

16    that point at a very high level, not in any

17    specific detail, down to the patient -- or I'm

18    sorry, the colleague or interviewee level.

19         Q.    Did they approve or at least

20    acquiesce in your contacting family members?

21         A.    Yes.

22         Q.    Were you permitted to tell family

23    members that there was an investigation being

24    conducted by the prosecutor?

25         A.    I think so.  I know at some point,
```

1          CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

2              DANIEL ROTH, M.D.

3      Q.    So that 3500 was a very unique

4  patient even in your scenario and mine?

5      A.    Every patient is unique because

6  that's the point.

7      Q.    And 500 would be appropriate for

8  certain patients, 500 micrograms would be

9  appropriate for some patients looking at that

10  specific patient?

11     A.    And excessive for others.

12     Q.    And 200 would be excessive for some

13  and reasonable for others, correct?

14     A.    Yes.

15     Q.    So that when you look at these

16  patients, they can't be looked at in an

17  aggregate; they must be looked at only on an

18  individual basis; is that correct?

19     A.    And in point of fact, right, we

20  identified in report 5, right, a number of

21  patients who were between 200 and 400 micrograms

22  and was case by case, and some we felt like were

23  not excessive and some we felt were.

24     Q.    So there is no number of 500 that

25  defines a medical standard that is

```
 1            CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

 2                      DANIEL ROTH, M.D.

 3        Q.    By January the 7th?

 4        A.    Yeah.

 5        Q.    We've identified every patient as of

 6   the 19th of December, have we not?

 7        A.    Correct.

 8        Q.    We had notified every family member

 9   by January -- sorry, December the 27th, correct?

10        A.    Of the ones that had been identified

11   up to that point in time, that's correct.

12        Q.    Including 27 at that point.

13        A.    I think that's right.

14        Q.    And then there was a secondary

15   notification to those families in early January

16   and I think it was actually before this, but

17   we'll look at that document.

18        A.    When we had a second conversation

19   with the families?

20        Q.    Yes.

21        A.    Yeah, it's the second Monday in

22   January.

23        Q.    So it really was Ed Lamb who was the

24   first person that says let's not call these

25   doses fatal, according to what we have in our
```

1         CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

2             DANIEL ROTH, M.D.

3  documents; is that fair?

4          MR. O'SHEA:  Objection.  That

5       mischaracterizes this very exhibit, but you

6       can answer.

7         THE WITNESS:  So the email is the

8       first time in this email thread that the

9       question is raised.

10  BY MR. GRAFF:

11     Q.    Then we have at the top of the first

12  page from Fred Gallaway to you, to Ed Lamb, to

13  the entire leadership team for this

14  investigation; would that be fair?

15     A.    Well, the bulk of it.

16     Q.    "Thanks, Ed.  Dan and I discussed it

17  this morning."  Would that be you and Bret

18  Gallaway?

19     A.    Yes.

20     Q.    "Of the 27 cases, we are confident

21  that the doses were fatal."  That's a

22  conversation from you, correct?

23     A.    That's what he says.

24     Q.    Is it accurately recorded or not?

25     A.    No, I don't think so.

```
 1              CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

 2                      DANIEL ROTH, M.D.

 3         Q.    Did you ever write back saying, no,

 4   that's not true?

 5         A.    Not that I recall.

 6         Q.    So "fatal in 17 of the cases.  Since

 7   that's more than half, we can say "most."  If

 8   pressed by a reporter, we could say that the

 9   number is at least 14."

10              This is your organization.  This is a

11   critical part, and we're talking about that

12   charged word of "fatal," and I don't see a

13   response from you.

14              Did you make no response?  Did you be

15   part of this conversation?

16         A.    I did.  It doesn't mean that it's not

17   reflected because it's not in the email.  I'm

18   certain that there were many conversations about

19   potentially fatal versus fatal and I would go

20   back to what we said publicly.

21         Q.    Now, I would argue that these people

22   were quite disparate in where they were working

23   at that time on January 8th; isn't that true?

24   Some were in Michigan.  Some were in Ohio.

25         A.    Yes.
```

1          CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

2                    DANIEL ROTH, M.D.

3      A.    Let me start over again because I

4  wasn't clear and I apologize.

5              So we identified a small number of

6  people, ultimately five, for whom all the

7  potential things that could have been done to

8  potentially reverse their short-term situation

9  weren't undertaken prior to having the

10 conversations with the family members where they

11 were told there was no chance of recovery.

12             One of those patients at least, but

13 one of those patients had undergone a procedure,

14 and we believe that they had a complication of

15 that procedure, and so one of the five was

16 related to a procedure at least, but the five is

17 a broader number.  Was that clear?

18     Q.    I'm trying to figure out.  So one had

19 a complication, but it wasn't rectified but you

20 believe could have been?

21     A.    Nothing's guaranteed, right, in

22 critical care, but there were potential options

23 that weren't undertaken, correct.

24     Q.    Do you know who those five patients

25 are?

1          CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

2                    DANIEL ROTH, M.D.

3          A.    Yes, I believe so.

4          Q.    Who are they?

5          A.    Can I answer this?

6                MR. O'SHEA:  Yes.  This will be

7          confidential.

8                THE WITNESS:  Okay.  Yes, includes

9          patients names I'm about to say, and I have

10         to make sure I get this right.

11    BY MR. GRAFF:

12         Q.    And those five are?

13         A.    ████████████████████████

14    ████████.  I'm blanking on the heart attack

15    patient.  I don't remember.

16                MR. LANDY:  Just for the record is

17    that ████████████████████████?

18                THE WITNESS:  Yes, thank you.  Those

19         are the three I remember off the top of my

20         head.

21    BY MR. GRAFF:

22         Q.    Is there a list you put together or a

23    report for Dr. Gilfillan?

24         A.    No.

25         Q.    Where would we find those names

1        CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

2                    DANIEL ROTH, M.D.

3    reflected in your investigation?

4        A.    I don't think they're specifically

5    recorded.

6        Q.    How would anyone know what five

7    patients you were talking about?

8        A.    We weren't sharing individual patient

9    names with the public, right, so we never told

10   the public individual patient names, so for the

11   purposes of this, we weren't prepared nor did we

12   share the specific five patients involved.

13       Q.    Did you share it with the family

14   members?

15       A.    Yes.

16       Q.    So at some time after --

17       A.    It's my understanding, yes.

18       Q.    Did you make those calls?

19       A.    No.

20       Q.    Do you know who made those calls?

21       A.    Do not.

22       Q.    Was there a script developed for

23   those calls?

24       A.    I don't remember.

25       Q.    I mean, I've not seen it.

```
 1            CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

 2                     DANIEL ROTH, M.D.

 3        A.    Yeah.

 4        Q.    Was ████████    the patient that

 5   underwent the procedure that had a complication?

 6        A.    Yes, she was.

 7        Q.    There was an article in the -- I

 8   don't know if it was an article.  There was an

 9   email from the -- I believe it's from the

10   Columbus Dispatch regarding questions from the

11   Columbus Dispatch, and I apologize because

12   somebody used a dark marker.

13               (Exhibit Number 85 marked.)

14   BY MR. GRAFF:

15        Q.    I can only tell you what is

16   represented in this email.

17        A.    Sure.

18        Q.    Now, have you seen this email before?

19        A.    I'm addressed on it so I assume so.

20        Q.    Well, I hope so.  And this was sent

21   from you to Dr. Gilfillan and to Dr. Ross?

22        A.    No, just esquire.

23        Q.    This came from Melissa Landers from

24   Mount Carmel to you and to Dan Hackett, correct?

25        A.    Go ahead, I'm sorry.  Yes.
```

1   CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

2              DANIEL ROTH, M.D.

3

4

5        C E R T I F I C A T E

6

7        I, PAMELA MOCERI, Certified Shorthand

8   Reporter and Notary Public, hereby certify

9   that this deposition was taken before me on

10  the date hereinbefore set forth; that the

11  foregoing questions and answers were

12  recorded by me stenographically and reduced

13  to computer transcription; that this is a

14  true, full, and correct transcript of my

15  stenographic notes so taken; and that I am

16  not related, nor of counsel, to either

17  party, nor interested in the event of this

18  cause.

19  Date : August 03, 2022

20

21              _Pamela Moceri_

22              _____
                Pamela Moceri, CSR

23

24

25

1          Confidential for Attorneys' Eyes Only

2              Daniel Roth, M.D. - Volume II

3            UNITED STATES DISTRICT COURT

4              SOUTHERN DISTRICT OF OHIO

5                  EASTERN DIVISION

6

7    REBECCA MCNEIL, BETH MACIOCE-

8    QUINN, EARLENE ROMINE, EDWARD

9    WRIGHT, BRANDI WELLS, AKEELA

10   BOWENS, AMELIA POWERS, CHAD

11   READOUT, JESSICA SHEETS, and

12   DERON LUNDY,

13

14              Plaintiffs,

15

16   -vs-                   Case No. 2:20-cv-258

17                             VOLUME II

18   MOUNT CARMEL HEALTH SYSTEM,

19   TRINITY HEALTH CORPORATION,

20   and EDWARD LAMB,

21              Defendants.

22   _____/

23       CONTINUED DEPOSITION OF DANIEL ROTH, M.D.
                     AUGUST 1, 2022
24          Reported by: Pamela Moceri

25       Job #: 214948

```
 1              Confidential for Attorneys' Eyes Only
 2                  Daniel Roth, M.D. - Volume II
 3         Q.     Raina -- and I'm going to probably
 4     butcher her last name -- Vretenar, 6-0 vote in
 5     favor of not terminating the employee; it says
 6     you were absent.  Once again, I presume you were
 7     not there for the discussion?
 8         A.     Correct.
 9         Q.     It says you were not there for the
10     vote, but do you know if she was terminated or
11     not?
12         A.     According to the notes, she was not
13     terminated.
14         Q.     Akeela Bowers, 7-0 in favor of not
15     terminating the employee.  Then presumably you
16     were there for that vote?
17         A.     Correct.
18         Q.     Do you recall the discussion?
19         A.     Vaguely.
20         Q.     Do you know if Akeela Bowers was
21     terminated?
22         A.     She was not.
23         Q.     Beth Macioce-Quinn, 7-0 in favor of
24     not terminating the employee.
25                Presumably you were there for the
```

```
 1            Confidential for Attorneys' Eyes Only

 2                 Daniel Roth, M.D. - Volume II

 3    discussion.  Do you recall the discussion.

 4         A.    Vaguely.

 5         Q.    Do you know if she was terminated?

 6         A.    She was not.

 7         Q.    Andrew Caputo, pharmacist, 6-1 in

 8    favor of termination.  Do you recall the

 9    discussion?

10         A.    Vaguely.

11         Q.    Do you know who the one person in

12    favor of not terminating Mr. Caputo was?

13         A.    I do not.

14         Q.    I presume that means it wasn't you?

15         A.    I don't recall.  If I recalled, I

16    would have said.

17         Q.    Do you know if Mr. Caputo was

18    terminated?

19         A.    He was according to the notes.

20         Q.    Jonathan Vang, 6-0 in favor of

21    termination.  You were absent.  Again I will ask

22    your recall of the discussion.

23         A.    I do not have a recall.  I was

24    absent.

25         Q.    Or of the vote because you were
```

1          Confidential for Attorneys' Eyes Only

2              Daniel Roth, M.D. - Volume II

3   not terminated in relation to his actions of

4   prescribing or administering -- not prescribing.

5   Let me rephrase that question.

6              Do you know if Damian Gonzalez was

7   not terminated in relation to his administration

8   or actions related to the prescribing of

9   Dr. Husel?

10     A.    That is correct, to the best of my

11  knowledge.

12     Q.    Nicole Pavlick, pharmacist, 7-0 in

13  favor of not terminating.  Presumably you have

14  no separate recollection of this discussion

15  either?

16     A.    Not specific to this particular

17  colleague, no.

18     Q.    Apparently you voted in favor of not

19  terminating her.  Would that be correct?

20     A.    Seems to be correct, that's right.

21     Q.    And to the best of your knowledge,

22  she was not terminated in relation to her

23  actions about Dr. Husel; is that correct?

24     A.    Correct.

25     Q.    Jessica Sheets.  This is a registered

1           Confidential for Attorneys' Eyes Only

2             Daniel Roth, M.D. - Volume II

3    nurse.  It's a 5-0 in favor of not terminating.

4             Once again, this is a different vote

5    than what we have seen before.  It shows that

6    all seven must -- should have been present

7    because it doesn't show either an abstention or

8    someone missing from the vote.

9             Do you have any recollection why this

10   vote is 5-0 in favor of not terminating?

11      A.   I do not have any specific

12   recollection as to this specific vote.

13      Q.   I have to ask again.  Are there any

14   documents that we would be able to look at?

15      A.   Not to the best of my knowledge.

16      Q.   Do you know if Jessica Sheets was

17   terminated for her relationships with -- for her

18   actions in relation to the administration of

19   medication of Dr. Husel?

20      A.   She was not.

21      Q.   Thien-Khanh Pantelis, pharmacist.

22   Once again, it shows a 6-0 vote in favor of not

23   terminating.

24             Do you have any separate recollection

25   of this pharmacist?

1          Confidential for Attorneys' Eyes Only

2              Daniel Roth, M.D. - Volume II

3          A.    Not to the best of my knowledge.

4          Q.    Do you know if Mr. Cheng was

5     terminated in relation to his actions regarding

6     the prescriptions that were used or his

7     relationship with Dr. Husel?

8          A.    He was not.

9          Q.    Brandi Wells, registered nurse, 5-0

10    in favor of not terminating.

11              Do you recall the discussion about

12    Ms. Wells?

13         A.    I do not specifically.

14         Q.    Do you know why the vote is 5-0

15    without showing any abstentions or any people

16    absent from the vote?

17         A.    I do not.

18         Q.    Do you have -- is there any document

19    that would give us that information?

20         A.    Not to my knowledge.

21         Q.    Do you know if Ms. Wells was

22    terminated in relationship to her administration

23    of medications regarding Dr. Husel?

24         A.    She was not.

25         Q.    Andrea Shaffer, 5 in favor of not

1    Confidential for Attorneys' Eyes Only

2         Daniel Roth, M.D. - Volume II

3

4         C E R T I F I C A T E

5

6

7         I, PAMELA MOCERI, Certified Shorthand

8    Reporter and Notary Public, hereby certify

9    that this deposition was taken before me on

10   the date hereinbefore set forth; that the

11   foregoing questions and answers were

12   recorded by me stenographically and reduced

13   to computer transcription; that this is a

14   true, full, and correct transcript of my

15   stenographic notes so taken; and that I am

16   not related, nor of counsel, to either

17   party, nor interested in the event of this

18   cause.

19   Dated: August 15, 2022

20         *Pamela Moceri*

21         Pamela Moceri, CSR

22

23

24

25