# EXHIBIT 36

| | |
|---|---|
| **From:** | Magi Curtis <MCurtis@jarrardinc.com> |
| **Sent:** | Monday, December 10, 2018 6:27 PM |
| **To:** | Bret Gallaway <gallawab@trinity-health.org>; murraym@trinity-health.org |
| **Cc:** | David Green <DGreen@jarrardinc.com>; Tim Stewart <tstewart@jarrardinc.com>; Molly Cate <MCate@jarrardinc.com> |
| **Subject:** | Privileged & Confidential: key questions and scenarios |

Privileged and Confidential

Bret,

Thanks for the call earlier today. As we mentioned when we talked, developing the national media plan and continuing to hear how the local efforts are progressing have really got our wheels turning about the specific angles we think this story could take nationally. The more we can eliminate certain variabilities (based on learning additional facts), the more laser-focused we can get on our national communications plan.

Given that, below are a number of critical questions that, if answered, would help us narrow the world of possible story angles.

Know that per our discussion today, we're also working on a larger, more comprehensive FAQ document and VIP list (as a stand-alone document the Trinity Health team can begin to fill-in).

**Critical Questions to Narrowing National Scenarios**
- Is there a clear, respected medical standard for how much pain medication is acceptable to provide before you reach a fatal limit?
    - If so, could we get a hold of any documentation on this?
    - If so, who sets the standard, does the AMA (or other reputable body) endorse the standard?
- Do we (Mount Carmel and/or Trinity Health) have a clearly defined policy on acceptable levels of pain medicine to prescribe and administer?
    - If yes, could we please get a copy of that policy.
    - If yes, are we confident Dr. Husel was made aware of this policy (and if so, how)?
    - If yes, are we confident that our ICU nurses were made aware of this policy (and if so, how)?
    - Either way, is there a documented system for checks and balances in place at Mount Carmel (and other Trinity Health facilities) that monitor the overall pain medication dose levels that are being prescribed?
        - If so, and we have checks and balances, how did this breakdown occur? With nurses and pharmacists and possibly other physicians.
- Were the nurses/pharmacists involved aware that the doses that were prescribed and administered were (at least potentially) fatal-level doses?
- From what we can tell, the notifications from 1-2 pharmacists began to arise in late October/early November about Dr. Husel prescribing large doses of pain medications for end-of-life care. Based on the look-back we hear is occurring, there are 20+ patients where something similar occurred over a (possible) 2-year period, so this didn't begin recently. Given that:
    - Are we confident that the three reports that occurred this fall are the only three that have come in about this practice?
    - If that's the case, how did this go unreported for so long?
- Are we confident that there are no other physicians/nurses using similar practices – either at Mount Carmel or at any other Trinity Health facility?
- We heard that Dr. Husel is calling our nurses:
    - Who is he calling?
    - What is he asking them to join him in?
    - Does his lawyer know he's calling?



CONFIDENTIAL

JAR_0001208

- The petition that was signed by 36 nurses and submitted requesting Dr. Husel's reinstatement – have we responded yet? Have we heard if more signatures are being gathered?
- Do we have any idea if the impacted patient families knew the dose of the medication being administered?
- Once we receive the external review report and recommendations, are we committed to taking our learnings from Mount Carmel and applying them to a Trinity Health systemwide effort (both policy development/implementation and a broader engagement with team members about end-of-life care)?
- The CEO at Mount Carmel is relatively new, is there evidence to report an increased focus on being a high-reliability organization since his arrival? And that possibly this reporting is a result of that focus?

As we learn answers to the questions above, we can narrow down the likelihood of the possible scenarios, outlined below. Until then, we must consider and prepare for all.

### Scenarios
- 1. Dr. Husel and nurses knew they were prescribing/administering fatal doses of pain medication because there is a clear medical standard; the administration was not aware they were doing so
    - Variations on this scenario:
        - 1a – Mount Carmel has a clear dosing policy, documented and trained-to
        - 1b – Mount Carmel doesn't have clear, documented and trained-to dosing policy
- 2. Dr. Husel knew the doses prescribed were fatal or against Mount Carmel policy, nurses didn't realize/weren't aware that the doses they were administering were fatal or against policy
    - Variations on this scenario:
        - 2a – there is a medical standard for safe pain medication doses that Dr. Husel should have known, and violated as a practicing physician, but Mount Carmel has no clear dosing policy; nurses didn't know about medical standard
        - 2b – there is no medical standard for safe (or fatal) pain medication doses, but Mount Carmel does have a clear dosing policy shared with physicians only (not nurses)
- 3. There is no clear medical standard and Mount Carmel does not have a clear, documented and trained-to dosing policy

### Scenario 1A: Dr. Husel and nurses knew the doses they were prescribing/administering were fatal (clear medical standard), and Mount Carmel has clear, documented and trained-to dosing policy
- Risks from a national story perspective:
    - Situation sets-up a dynamic where the emotional energy could go in favor of the doctor/nurses (they knew what they were doing was against standard/policy, but they did it because they believed it was the most humane thing to do for their patients)
    - Potential of it looking like the hospital leadership isn't in control (because there was a clear medical standard and hospital policy and it was broken for so long without anyone being aware or raising the flag)
- Variable: if the county prosecutor finds that Dr. Husel (and nurses involved) were involved in criminal acts and moves to bring charges, this certainly lessens, but does not eliminate, the public perception hit for Mount Carmel/Trinity Health in the national story
- What we can do:
    - Our response must include both emotional and doctrinal elements
        - We will need to determine what our argument is emotionally
        - We will need to determine who can deliver it, should include:
            - Clinical leader from Trinity Health
            - Mission leader from Trinity Health (this is likely the most important spokesperson, it's where the emotional element will be delivered)
    - Two possible response strategies, both similar in nature but with unique twists (could do both):
        - Setting-up a national discourse between two sides (Catholic representation on ERDs and those who believe that we should make patients comfortable at end-of-life, even if it brings about end-of-life sooner). Acknowledge that both sides care deeply about human life and that the goal is to begin a civilized discussion about how to resolve ethical issues that are a part of the core foundation of Catholic organization with individual moral issues (of our employees) that may

CONFIDENTIAL

differ.
- Announce a commitment to some sort of effort (be it a speaker series, a summit, a training program…all post external review findings are available) all aimed at enhancing our protocols around end-of-life care.
- In any situation:
  - Be sure that our language doesn't unintentionally mobilize the opposition.
  - Include something that demonstrates our compassion, "like providers across the country, we provide medication to ensure our end-of-life patients are comfortable…"
- Risks of the approach above
  - We must be committed to long-term action if we announce either of these
  - We further national debate and draw more attention (possible fire) our way
  - We get our base fired up and this can have consequences
- Risk of not doing this
  - We just take the hits and look like our leaders didn't know what was going on, we let the news happen to us instead of trying to take-hold of the narrative

**Scenario 1B: Dr. Husel and nurses knew the doses they were prescribing/administering were fatal because of clear medical standard, but Mount Carmel did not have a clear, documented and trained-to dosing policy**
- Risks from a national story perspective:
  - Mount Carmel and Trinity Health are particularly vulnerable to a story that doesn't play favorably for either, if Dr. Husel is found to have broken a clear medical standard but we don't have or haven't been clear on our own dosing policy. Such a story could play that leadership looks like they weren't on-the-ball from the beginning (by not having a policy if there is a national standard) and then the double hit is that when we became alerted to what was being done and felt like it was violating our ethical codes (even though we didn't have a policy) we fired a respected physician and ruined his career, and potentially took disciplinary action against nurses and pharmacists.
- Variables:
  - Need to learn more about what standards there are in place for nurses to know medical standards, even beyond hospital standards

- What we can do
  - Apologize to our nurses for not having a policy in place and putting them at risk for breaking the law
  - Commit to putting clear policies in place – at Mount Carmel and Trinity-wide
  - Educate and engage our teams around policies
  - Two possible response strategies, both similar in nature but with unique twists. See scenario 1A response for further detail on these response strategies:
    - Setting-up a national discourse between two sides (Catholic representation on ERDs and those who believe that we should make patients comfortable at end-of-life, even if it brings about end-of-life sooner). Acknowledge that both sides care deeply about human life and that the goal is to begin a civilized discussion about how to resolve ethical issues that are a part of the core foundation of Catholic organization with individual moral issues (of our employees) that may differ.
    - Announce a commitment to some sort of effort (be it a speaker series, a summit, a training program…all post external review findings are available) all aimed at enhancing our protocols around end-of-life care.

**Scenario 2a: There is a medical standard for safe pain medication doses that Dr. Husel should have known, and violated as a practicing physician, but Mount Carmel has no clear dosing policy; nurses didn't know about medical standard**
- Risks from a national story perspective:
  - Could looks like the hospital is out of control, not managing well on clear medical standards that are also aligned with our ethical and religious standards
  - Could get worse if it plays that there are now 20+ nurses are left feeling guilty for the rest of their lives

CONFIDENTIAL

JAR_0001210

- (whether charged criminally or just the internal guilt) because they didn't know what they were doing was against medical standards
- Variables:
  - Again, need to learn more about what standards there are in place for nurses to know medical standards, even beyond hospital standards
  - This scenario will be particularly bad for us if we discipline any nurses and they were unaware of a medical standard (and that they broke it) because we didn't inform them.
- What we can do
  - Say we assume all our physicians comply with all medical standards, regardless of hospital policies
  - Apologize to our nurses for not having a policy in place and putting them at risk for breaking the law
  - Offer them counseling services to deal with potential feelings of guilt
  - Commit to putting clear policies in place – at Mount Carmel and Trinity-wide
  - Educate and engage our teams around policies
  - Two possible response strategies, both similar in nature but with unique twists. See scenario 1A response for further detail on these response strategies:
    - Setting-up a national discourse between two sides (Catholic representation on ERDs and those who believe that we should make patients comfortable at end-of-life, even if it brings about end-of-life sooner). Acknowledge that both sides care deeply about human life and that the goal is to begin a civilized discussion about how to resolve ethical issues that are a part of the core foundation of Catholic organization with individual moral issues (of our employees) that may differ.
    - Announce a commitment to some sort of effort (be it a speaker series, a summit, a training program...all post external review findings are available) all aimed at enhancing our protocols around end-of-life care.

**Scenario 2b: There is no medical standard for safe (or fatal) pain medication doses, but Mount Carmel does have a clear dosing policy shared with physicians only (not nurses)**

- Risks:
  - Nurse risk: looks like hospital didn't educate nurses on clear policy; Mount Carmel has failed the 20+ nurses involved (and frankly all nurses) if we didn't make them aware of a hospital-wide policy
  - Leadership will look out-of-touch with hospital happenings if we had a clear policy in place but were not alerted of violation until Oct. of this year?
  - National story likely to be less emotional but more focuses on a management issue
- What we do
  - Apologize to our nurses for not informing them of an important patient policy
  - Offer them counseling services to deal with potential feelings of guilt
  - Apologize to families that this went against our policy for so long without getting rectified
  - Commit to educating and engage our teams around policies (Mount Carmel and Trinity-wide)
  - Two possible response strategies, both similar in nature but with unique twists. See scenario 1A response for further detail on these response strategies:
    - Setting-up a national discourse between two sides (Catholic representation on ERDs and those who believe that we should make patients comfortable at end-of-life, even if it brings about end-of-life sooner). Acknowledge that both sides care deeply about human life and that the goal is to begin a civilized discussion about how to resolve ethical issues that are a part of the core foundation of Catholic organization with individual moral issues (of our employees) that may differ.
    - Announce a commitment to some sort of effort (be it a speaker series, a summit, a training program...all post external review findings are available) all aimed at enhancing our protocols around end-of-life care.

**Scenario 3: There is no clear medical standard and Mount Carmel does not have a clear, documented and trained-to dosing policy**

- Risk:

CONFIDENTIAL

JAR_0001211

- Situation sets-up a dynamic almost guaranteed for the emotional energy to go in favor of the doctor/nurses because there is no medical standard and Mount Carmel didn't have a clear policy and all involved believed that what they were doing was the most humane thing to do for their patients
- There is no clear medical standard and Mount Carmel didn't have a clear policy, which makes leadership looks like it has decided on a whim when we became alerted to what was being done and felt like it was violating our ethical codes (even though we didn't have a policy) then we fired a respected physician and ruined his career.

- Variable:
    - If Dr. Husel and any nurses are charged, it lessens the blow for Mount Carmel and Trinity Health in this scenario. But it will still likely be a national, emotionally charged story that will spark great debate.
- What we do
    - Apologize to families for bringing up a painful discussion
    - Apologize to employees and physicians for taking a stance when we didn't have a clearly defined policy
    - Commit to developing policies around this issue and educating and engage our teams around new policies (Mount Carmel and Trinity-wide)
    - Two possible response strategies, both similar in nature but with unique twists. See scenario 1A response for further detail on these response strategies:
        - Setting-up a national discourse between two sides (Catholic representation on ERDs and those who believe that we should make patients comfortable at end-of-life, even if it brings about end-of-life sooner). Acknowledge that both sides care deeply about human life and that the goal is to begin a civilized discussion about how to resolve ethical issues that are a part of the core foundation of Catholic organization with individual moral issues (of our employees) that may differ.
        - Announce a commitment to some sort of effort (be it a speaker series, a summit, a training program...all post external review findings are available) all aimed at enhancing our protocols around end-of-life care.

Look forward to talking tomorrow.

-Magi

**Magi Curtis**
*Jarrard Phillips Cate & Hancock, Inc.*

219 Ward Circle
Brentwood, TN 37027
o: 615.254.0575
c: 202.421.8657
jarrardinc.com

Subscribe to our thinking:

 

Follow Us:

  

CONFIDENTIAL

JAR_0001212

CONFIDENTIAL

JAR_0001213