# EXHIBIT 50

# HIGH-LEVEL QUESTIONS FOR DECISION

**Version: 12.18.18; 5:30 pm EST**

1. **Who is the "Villain" in our Victim/Villain/Vindicator crisis communications narrative?**

    a. CHOICES
        1. Husel
        2. Husel, Nurses, Pharmacists
        3. Culture at West ICU Night Shift
        4. The act of killing someone with pain meds

    b. DISCUSSION TOPICS:
        1. Some will say identifying a wrongdoer conflicts with "Just Culture"
        2. There are different levels of culpability and MCHS needs to identify and point to this fact
        3. Husel is popular with some staff and may even remain popular (as a martyr for Dying Well) even if indicted
        4. The less focus on Husel, the more focus on MCHS and a system-wide deficiency

    c. ED'S DECISION:
        1. Husel primary, involved pharmacists (not the one who did the primary VOICE report). And the nurses (not the two with preceptors) as co-villains
        2. Use language that these (others than Husel) are otherwise good people who made poor decisions and chose to ignore a series of MCHS protocols and safeguards

2. **How much do we want to talk about "Dying Well" or the issue of end of life pain management?**

    a. CHOICES:
        1. Start a national debate on this issue
        2. Respond to questions asked by press interested in the debate
        3. Divert the debate to the narrower issue of breaking the law

    b. DISCUSSION TOPICS:
        1. This is issue already at the forefront of healthcare and MCHS can show national leadership
        2. The general public has starkly different views on this than the Catholic Church and we will be stuck in the middle
        3. Talking about this issue may sound like we are defending Husel
        4. Talking about this issue may allow seem like we are shifting focus away from the crimes

    c. ED'S DECISION:



EXHIBIT 40
Lander
4-2-22 DK

1. We do not want to affirmatively spark a national debate on euthanasia or overly aggressive use of medication for dying patients

2. If we get media questions along these lines, we bridge to narrower topics about our response to this unique set of facts

3. **How shall we describe MCHS response to this situation?**
   a. CHOICES:
      1. We highlight our discovery and quick response to the problem
      2. We factually give the details of what we did and allow others to decide if we acted correctly
      3. We acknowledge that we could have had a better response to this
      4. We apologize for not having a better response and commit to change

   b. DISCUSSION TOPICS:
      1. Prosecutor has already lauded our response and may do so publicly
      2. If we want to appear contrite over this, overdoing our response may diminish our contrition
      3. Some will say the October-November period shows we were slow, not fast
      4. Some will say our culture and training led to this and we're as much as fault as Husel

   c. ED'S DECISION:
      1. Factually describe the timeline in a way that is transparent and active
      2. Include the October triggering event with the context that it was out of character for Husel and appropriately referred to peer review
      3. Include that Dr. Swanner began investigating within an hour of the November VOICE message reached him

4. **Who does MCHS terminate other than Husel?**

   a. CHOICES
      1. All Nurses and Pharmacists involved at any level
      2. Some of Nurses and Pharmacists, based on individual culpability
      3. No one other than Husel terminated, but all Nurse and Pharmacists disciplined/further trained
      4. No one other than Husel and no discipline/further training

   b. DISCUSSION TOPICS
      1. Terminations send an internal and external message about who was at fault
      2. Coverage issues in West ICU
      3. Some employees will see wide spread terminations as blame-shifting
      4. Allowing the people who injected the drugs to remain on staff while Husel is terminated may seem inequitable
      5. Prosecutor may consider terminations to be improper retaliation

2

CONFIDENTIAL

TMCN0109208

    6. Lawsuits may likely follow terminations and each lawsuit will bring more potential press attention

  c. ED'S DECISION:
    1. Decision already made

5. **What kind of review/investigation going to conduct?**
  a. CHOICE:
    1. Only those required (RCA, Peer Review, etc)
    2. All of those required, plus an internal review that will not be made public
    3. All of those required, plus an outside group that makes private (perhaps privileged) recommendations
    4. All of those required, plus an outside group that makes public recommendations

  b. DISCUSSION TOPICS:
    1. A best practice in crisis communications is to allow outside review and report
    2. Outside review and report shows transparency and willingness to improve
    3. The outside experts may find weaknesses or problems we don't know about
    4. The report is likely admissible in court if there is a trial (unlikely) unless it is privileged

  c. ED'S DECISION:
    1. Subject to attorney input, move forward with outside commission with public report
    2. NDAs to potential members to see if willing to serve
    3. Goal is to announce the formation and members on R Day or D Day

6. **How much media commentary are we willing to offer beyond the initial "D Day" or "R Day" video release?**

  a. CHOICES:
    1. Stand on initial statement and only answer other questions off camera and on background
    2. Prepare a second and third wave of media statements as the issue develop and release as video statements
    3. Conduct on the record interviews, one on one with each reporter, and speak on camera and on the record
    4. Conduct news conference(s) and answer all questions on camera and on the record

  b. DISCUSSION TOPICS:
    1. One statement will not be enough beyond the first few news cycles

3

CONFIDENTIAL

TMCN0109209

2. Having too many statements causes potential concerns about lack of message discipline
3. Answering all media inquiries can lead to deeper and prolonged coverage
4. News conferences tend to get out of control and embolden reporters to ask more aggressive questions
5. Not responding to media inquiries shows a lack of transparency and is counter to the image of a vindicator
6. All media statements are admissible at trial and will affect the settlement process of claims (either way)

c. ED'S DECISION:
   1. On the record interviews, one on one
   2. Select subject matter experts
   3. New round of media training, on this fact pattern

7. **What need is there to undertake a dialogue with colleagues about the front-line issues of death and dying?**

   a. CHOICES:
      1. Conduct a system wide listening and discussion series to show the executive team's concern for colleagues' views
      2. Meet just with ICU teams system wide for listening and discussion to show the executive team's concern for colleagues' views
      3. Meet just with the West ICO colleagues for a listening and discussion to show the executive team's concern for colleagues' views
      4. Allow the current training that's occurring to be the vehicle for listening and discussion to show the executive team's concern for colleagues' views

   b. DISCUSSION TOPICS:
      1. Employees may feel we don't understand their situation
      2. Morale needs to be addressed in some fashion
      3. Loss of productivity if too many sessions

   c. ED'S DECISION:
      1. Current training and tiered huddles are all that's necessary absent additional information that shows such an effort is needed

8. **How proactive do want to be to garner national news coverage?**

   a. CHOICES:
      1. Affirmatively pitch the story to national press outlets rather than wait to see if they pick up the wire coverage
      2. Respond aggressively to national media inquiries at they come, positively framing the story as one about the MCHS response
      3. Respond in limited fashion to national media inquiries at they come, positively framing the story as one about the MCHS response
      4. Ignore national media and focus on local coverage

4

CONFIDENTIAL

TMCN0109210

b. DISCUSSION TOPICS:
1. We may not be able to control whether national news covers this
2. We can't really ignore media inquiries
3. Additional and intense media training will be needed
4. National press will attempt to sensationalize this

c. ED'S DECISION:
1. We ought not seek national media coverage
2. We should respond promptly to national media inquiries
3. Focus on the MCHS to this unique set of facts

9. **How to respond to social media commentary?**

a. CHOICES:
1. Allow all negative comments to remain on the MCHS Facebook page and do not respond in the comments
2. Allow all negative comments to remain on the MCHS Facebook page but respond in the comments and in other streams
3. Delete/hide negative comments on MCHS Facebook page and respond in other streams
4. Delete/hide negative comments on MCHS Facebook page and do not respond in other streams

b. DISCUSSION TOPICS:
1. Facebook commentary on these topics is typically negative
2. If we do leave comments, we must be fact based and not overly defensive
3. We will need a robust social media monitoring effort
4. Hiding comments is typically better than deleting them (less pushback from posters)
5. Twitter should be monitored, and we can respond but it is less crucial than with Facebook
6. We should consider a subpage on the MCHS page of "Situation Facts" that we can include as a link in all social media responses

c. ED'S DECISONS:
1. Unless comments are obscene or defamatory, leave comments up
2. MCHS will monitor and respond on comments where needed
3. Responses should be flat and even-toned
4. Where appropriate, include link to MCHS website fact page

###

5

CONFIDENTIAL

TMCN0109211